# PARISI *v.* DAVIDSON ET AL.

No. 70–91.   Argued October 19–20, 1971—Decided February 23, 1972

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. DOUGLAS, J., filed an opinion concurring in the result, *post,* p. 46. POWELL and REHNQUIST, JJ., took no part in the consideration or decision of the case.

*Richard L. Goff* argued the cause for petitioner.   With him on the briefs were *George A. Blackstone* and *Stephen V. Bomse.*

*William Terry Bray* argued the cause for respondents. On the brief were *Solicitor General Griswold, Assistant Attorney General Mardian, William Bradford Reynolds, Robert L. Keuch,* and *Robert A. Crandall.*

MR. JUSTICE STEWART delivered the opinion of the Court.

When a member of the armed forces has applied for a discharge as a conscientious objector and has exhausted all avenues of administrative relief, it is now settled that he may seek habeas corpus relief in a federal district court on the ground that the denial of his application had no basis in fact. The question in this case is whether the district court must stay its hand when court-martial proceedings are pending against the serviceman.

The petitioner, Joseph Parisi, was inducted into the Army as a draftee in August 1968. Nine months later he applied for a discharge as a conscientious objector, claiming that earlier doubts about military service had crystallized into a firm conviction that any form of military activity conflicted irreconcilably with his religious beliefs. He was interviewed by the base chaplain, the base psychiatrist, and a special hearing officer. They all attested to the petitioner's sincerity and to the religious content of his professed beliefs. In addition, the commanding general of the petitioner's Army training center and the commander of the Army hospital recommended that the petitioner be discharged as a conscientious objector. His immediate commanding officer, an Army captain, disagreed, recommending disapproval of the application on the ground that the petitioner's beliefs were based on essentially political, sociological, or philosophical views, or on a merely personal moral code.

In November 1969, the Department of the Army denied the petitioner conscientious objector status, on the grounds that his professed beliefs had become fixed prior to entering the service and that his opposition to war was not truly based upon his religious beliefs. On November 24, 1969, the petitioner applied to the Army Board for Correction of Military Records (hereafter

sometimes ABCMR) for administrative review of that determination.

Four days later the petitioner commenced the present habeas corpus proceeding in the United States District Court for the Northern District of California, claiming that the Army's denial of his conscientious objector application was without basis in fact. He sought discharge from the Army and requested a preliminary injunction to prevent his transfer out of the jurisdiction of the District Court and to prohibit further training preparatory to being transferred to Vietnam. The District Court declined at that time to consider the merits of the habeas corpus petition, but it retained jurisdiction pending a decision by the ABCMR, and in the meantime enjoined Army authorities from requiring the petitioner to participate in activity or training beyond his current noncombatant duties.

Shortly thereafter the petitioner received orders to report to Fort Lewis, Washington, for deployment to Vietnam, where he was to perform noncombatant duties similar to those that had been assigned to him in this country. He sought a stay of this redeployment order pending appeal of the denial of habeas corpus, but his application was denied by the Court of Appeals, on the condition that the Army would produce him if the appeal should result in his favor. A similar stay application was subsequently denied by MR. JUSTICE DOUGLAS as Ninth Circuit Justice, *Parisi* v. *Davidson,* 396 U. S. 1233. The petitioner then reported to Fort Lewis. He refused, however, to obey a military order to board a plane for Vietnam. As a result, he was charged with violating Art. 90 of the Uniform Code of Military Justice, 10 U. S. C. § 890, and, on April 8, 1970, a court-martial convicted him of that military offense.[1]

---

[1] At the time of oral argument of the present case, an appeal from this conviction was pending in a court of military review.

While the court-martial charges were pending, the Army Board for Correction of Military Records notified the petitioner that it had rejected his application for relief from the Army's denial of his conscientious objector application. The District Court then ordered the Army to show cause why the pending writ of habeas corpus should not issue. On the Government's motion, the District Court, on March 31, 1970, entered an order deferring consideration of the habeas corpus petition until final determination of the criminal charge then pending in the military court system. The Court of Appeals for the Ninth Circuit affirmed this order, concluding that "habeas proceedings were properly stayed pending the final conclusion of Parisi's military trial and his appeals therefrom," 435 F. 2d 299, 302. We granted certiorari, 402 U. S. 942.

In affirming the stay of the petitioner's federal habeas corpus proceeding until completion of the military courts' action, the Court of Appeals relied on the related doctrines of exhaustion of alternative remedies and comity between the federal civilian courts and the military system of justice. We hold today that neither of these doctrines required a stay of the habeas corpus proceedings in this case.

With respect to available *administrative* remedies, there can be no doubt that the petitioner has fully met the demands of the doctrine of exhaustion—a doctrine that must be applied in each case with an "understanding of its purposes and of the particular administrative scheme involved." *McKart* v. *United States,* 395 U. S. 185, 193. The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies. *Id.,* at 194–195;

*McGee* v. *United States*, 402 U. S. 479, 485; K. Davis, Administrative Law Treatise § 20.01 *et seq.* (Supp. 1970).

In this case the petitioner fully complied with Army Regulation 635–20, which dictates the procedures to be followed by a serviceman seeking classification as a conscientious objector on the basis of beliefs that develop after induction.[2] Moreover, following a rule of the Ninth Circuit then in effect,[3] he went further and appealed to the Army Board for Correction of Military Records.[4] The procedures and corrective opportunities

---

[2] The right of a person in the armed forces to be classified as a conscientious objector after induction is bottomed on Department of Defense Directive No. 1300.6 (May 10, 1968), issued by the Secretary of Defense pursuant to his authority under 10 U. S. C. § 133. The purpose of the directive is to provide "uniform procedures for the utilization of conscientious objectors in the Armed Forces and consideration of requests for discharge on the grounds of conscientious objection." Army Regulation 635–20 was issued to effectuate the broader policies announced in DOD Directive No. 1300.6.

[3] Under the rule of *Craycroft* v. *Ferrall*, 408 F. 2d 587 (CA9 1969), the petitioner was required to appeal the Department of the Army's decision to the civilian Army Board for Correction of Military Records in order to exhaust military administrative remedies and have access to federal court. Current governmental policy rejects *Craycroft*. Compliance with Army Regulation 635–20, not perfection of an ABCMR appeal, marks the point when military administrative procedures have been exhausted. Department of Justice Memo. No. 652 (Oct. 23, 1969). In *Craycroft* v. *Ferrall*, 397 U. S. 335, this Court vacated the judgment of the Ninth Circuit that the petitioner there had to appeal to the Board for the Correction of Naval Records before proceeding in federal court. But our decision was announced on March 30, 1970, more than four months after the present petitioner had appealed to the ABCMR.

[4] In 1946, Congress enacted legislation empowering the service secretaries, acting through boards of civilian officers of their respective departments, to alter military records when necessary to prevent injustice. Legislative Reorganization Act of 1946, § 207, 60 Stat. 837, as amended by 70A Stat. 116, 10 U. S. C. § 1552 (1952

of the military administrative apparatus had thus been wholly utilized at the time the District Court entered its order deferring consideration of the petitioner's habeas corpus application.

It is clear, therefore, that, if the court-martial charge had not intervened, the District Court would have been wrong in not proceeding to an expeditious consideration of the merits of the petitioner's claim. For the writ of habeas corpus has long been recognized as the appropriate remedy for servicemen who claim to be unlawfully retained in the armed forces. See, *e. g., Eagles* v. *Samuels,* 329 U. S. 304, 312; *Oestereich* v. *Selective Service Board,* 393 U. S. 233, 235; *Schlanger* v. *Seamans,* 401 U. S. 487, 489. And, as stated at the outset, that writ is available to consider the plea of an in-service applicant for discharge as a conscientious objector who claims that exhaustion of military administrative procedures has led only to a factually baseless denial of his application. *In re Kelly,* 401 F. 2d 211 (CA5); *Hammond* v. *Lenfest,* 398 F. 2d 705 (CA2).[5]

But since a court-martial charge was pending against the petitioner when he sought habeas corpus in March 1970, the respondents submit that the Court of Appeals was correct in holding that the District Court must

---

ed., Supp. IV). Pursuant to this legislation, each service established a board for the correction of military records whose function is, on application by a serviceman, to review the military record and intervene where necessary to correct error or remove injustice. 10 U. S. C. § 1552 (a).

[5] The Department of Justice, in consultation with the Department of Defense, has accepted the holdings of the *Kelly* and *Hammond* cases. Department of Justice Memo. No. 652 (Oct. 23, 1969). See *United States ex rel. Brooks* v. *Clifford,* 409 F. 2d 700, 701 (CA4). Compare *Noyd* v. *McNamara,* 378 F. 2d 538 (CA10), with *Polsky* v. *Wetherill,* 403 U. S. 916, vacating judgment in 438 F. 2d 132 (CA10).

await the final outcome of those charges in the military judicial system before it may consider the merits of the petitioner's habeas corpus claim. Although this argument, too, is framed in terms of "exhaustion," it may more accurately be understood as based upon the appropriate demands of comity between two separate judicial systems.[6] Requiring the District Court to defer to the military courts in these circumstances serves the interests of comity, the respondents argue, by aiding the military judiciary in its task of maintaining order and discipline in the armed services and by eliminating "needless friction" between the federal civilian and military judicial systems. The respondents note that the military constitutes a "specialized community governed by a separate discipline from that of the civilian," *Orloff* v. *Willoughby,* 345 U. S. 83, 94; *Gusik* v. *Schilder,* 340 U. S. 128, and that in recognition of the special nature of the military community, Congress has created an autonomous military judicial system, pursuant to Art. I,

---

[6] The respondents do not contend that the military courts have a special competence in determining if a conscientious objector application has been denied without basis in fact. As they acknowledge in their brief:

"Plainly, judicial review of the factual basis for the Army's denial of petitioner's conscientious objector claim does not require an interpretation of 'extremely technical provisions of the Uniform Code [of Military Justice] which have no analogs in civilian jurisprudence,'" quoting *Noyd* v. *Bond,* 395 U. S. 683, 696.

Thus, it is not contended that exhaustion of military court remedies—like exhaustion of military administrative remedies—is required by the principles announced in *McKart* v. *United States,* 395 U. S. 185, and *McGee* v. *United States,* 402 U. S. 479.

The concept of "exhaustion" in the context of the demands of comity between different judicial systems is closely analogous to the doctrine of abstention. For a discussion of the exhaustion and abstention doctrines in the federal-state context, see generally C. Wright, Handbook of the Law of Federal Courts 186–188, 196–208 (2d ed. 1970).

§ 8, of the Constitution.[7] They further point out that civilian courts, out of respect for the separation-of-powers doctrine and for the needs of the military, have rightly been reluctant to interfere with military judicial proceedings.[8]

But the issue in this case does not concern a federal district court's direct intervention in a case arising in the military court system. Cf. *Gusik* v. *Schilder, supra; Noyd* v. *Bond,* 395 U. S. 683. The petitioner's application for an administrative discharge—upon which the habeas corpus petition was based—antedated and was independent of the military criminal proceedings.

The question here, therefore, is whether a federal court should postpone adjudication of an independent civil lawsuit clearly within its original jurisdiction. Under accepted principles of comity, the court should stay its hand only if the relief the petitioner seeks—discharge as a conscientious objector—would also be available to him with reasonable promptness and certainty through the machinery of the military judicial system in its

---

[7] Barker, Military Law—A Separate System of Jurisprudence, 36 U. Cin. L. Rev. 223 (1967); Warren, The Bill of Rights and the Military, 37 N. Y. U. L. Rev. 181 (1962). Military courts are legislative courts; their jurisdiction is independent of Art. III judicial power. Following World War II, Congress, in an attempt to reform and modernize the system of military law, created the Uniform Code of Military Justice, Act of May 5, 1950, c. 169, 64 Stat. 107. In 1968, the Code was amended by the Military Justice Act, 10 U. S. C. § 819, to improve court-martial and review procedures.

[8] See *Hammond* v. *Lenfest,* 398 F. 2d 705, 710 (CA2 1968):

"Judicial hesitancy when faced with matters touching on military affairs is hardly surprising in view of the doctrine of separation of powers and the responsibility for national defense which the Constitution . . . places upon the Congress and the President. Moreover, the ever-present and urgent need for discipline in the armed services would alone explain the relative freedom of the military from judicial supervision."

processing of the court-martial charge. *Griffin* v. *County School Board of Prince Edward County,* 377 U. S. 218, 229; *Davis* v. *Mann,* 377 U. S. 678, 690–691; *Lucas* v. *Forty-Fourth General Assembly of Colorado,* 377 U. S. 713, 716–717. For the reasons that follow, we are not persuaded that such relief would be even potentially available, much less that it would be either prompt or certain.

Courts-martial are not convened to review and rectify administrative denials of conscientious objector claims or to release conscientious objectors from military service. They are convened to adjudicate charges of criminal violations of military law. It is true that the Court of Military Appeals has held that a soldier charged in a court-martial with refusal to obey a lawful order may, in certain limited circumstances, defend upon the ground that the order was not lawful because he had wrongfully been denied an administrative discharge as a conscientious objector. *United States* v. *Noyd,* 18 U. S. C. M. A. 483, 40 C. M. R. 195.[9] The scope of the *Noyd* doctrine is narrow, *United States* v. *Wilson,* 19 U. S. C. M. A. 100,

---

[9] Army Regulation 635-20 provides that

"individuals who have submitted formal applications [for conscientious objector status] . . . will be retained in their units and assigned duties providing the minimum practicable conflict with their asserted beliefs pending a final decision on their applications."

*Noyd* involved an Air Force officer who, after being denied conscientious objector status, refused to obey an order to instruct student pilots to fly a fighter plane used in Vietnam. Noyd's commanding officer had refrained from ordering the accused to give such instruction until the application had been processed and denied. As the Court of Military Appeals said:

"The validity of the order [to instruct students], therefore, depended upon the validity of the Secretary's decision [rejecting the conscientious objector application] . . . If the Secretary's decision was illegal, the order it generated was also illegal." *United States* v. *Noyd,* 18 U. S. C. M. A. 483, 492, 40 C. M. R. 195, 204.

41 C. M. R. 100, and its present vitality not wholly clear, *United States* v. *Stewart,* 20 U. S. C. M. A. 272, 43 C. M. R. 112.   A *Noyd* defense, therefore, would be available, even arguably, only in an extremely limited category of court-martial proceedings.   But even though we proceed on the assumption that *Noyd* offered this petitioner a potential affirmative defense to the court-martial charge brought against him,[10] the fact remains that the *Noyd* doctrine offers, at best, no more than a defense to a criminal charge.   Like any other legal or factual defense, it would, if successfully asserted at trial or on appeal, entitle the defendant to only an acquittal[11]—not to the discharge from military service that he seeks in the habeas corpus proceeding.

The respondents acknowledge, as they must, the limited function of a *Noyd* defense in the trial and appeal of the court-martial proceeding itself.   But they suggest that, if the military courts should eventually acquit the petitioner on the ground of his *Noyd* defense, then the petitioner may have "an available remedy by way of habeas corpus in the Court of Military Appeals."[12] In support of this suggestion, the respondents point to the All Writs Act, 28 U. S. C. § 1651 (a), and to cases in which the Court of Military Appeals has exercised

---

[10] The petitioner did, in fact, interpose a *Noyd* defense at his court-martial trial, and it was rejected upon the military judge's finding that "the ruling of the Secretary of the Army was not arbitrary, capricious, unreasonable, or an abusive [*sic*] discretion."

[11] We have been referred to no reported military court decision (including *Noyd* itself) that has yet acquitted a defendant upon the basis of a *Noyd* defense.

[12] If the military courts should ultimately acquit the petitioner on grounds other than wrongful denial of his conscientious objector application, the respondents acknowledge that he could not seek habeas corpus in the military judicial system.   In this event, therefore, the petitioner could clearly not obtain the relief that he seeks in the military court system.

power under that Act to order servicemen released from military imprisonment pending appeals of their court-martial convictions. See *Noyd* v. *Bond,* 395 U. S., at 695; *Levy* v. *Resor,* 17 U. S. C. M. A. 135, 37 C. M. R. 399; *United States* v. *Jennings,* 19 U. S. C. M. A. 88, 41 C. M. R. 88; *Johnson* v. *United States,* 19 U. S. C. M. A. 407, 42 C. M. R. 9.

But the All Writs Act only empowers courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions . . . ," and the jurisdiction of the Court of Military Appeals is limited by the Uniform Code of Military Justice to considering appeals from court-martial convictions. 10 U. S. C. § 867; *United States* v. *Snyder,* 18 U. S. C. M. A. 480, 40 C. M. R. 192. That court has been given no "jurisdiction" to consider a serviceman's claim for discharge from the military as a conscientious objector.

Whether this conceptual difficulty might somehow be surmounted is a question for the Court of Military Appeals itself ultimately to decide. See *United States* v. *Bevilacqua,* 18 U. S. C. M. A. 10, 12, 39 C. M. R. 10, 12. But the short answer to the respondents' suggestion in this case is the respondents' own concession that that court has, to date, never so much as intimated that it has power to issue a writ of habeas corpus granting separation from military service to a conscientious objector. We conclude here, therefore, as in *Noyd* v. *Bond, supra,* at 698 n. 11, that the petitioner cannot "properly be required to exhaust a remedy which may not exist." [13] Accordingly, we reverse the judg-

---

[13] This result is not inconsistent with the need to maintain order and discipline in the military and to avoid needless friction between the federal civilian and military judicial systems. If the *Noyd* defense is available and if the order that the petitioner disobeyed was unlawful if his conscientious objector claim is valid, then allowing him to proceed in federal district court as soon as military

ment of the Court of Appeals and remand the case to the District Court with directions to give expeditious consideration to the merits of the petitioner's habeas corpus application.

In holding as we do today that the pendency of court-martial proceedings must not delay a federal district court's prompt determination of the conscientious objector claim of a serviceman who has exhausted all administrative remedies, we no more than recognize the historic respect in this Nation for valid conscientious objection to military service. See 50 U. S. C. App. § 456 (j); *United States* v. *Seeger,* 380 U. S. 163.[14] As the Defense Department itself has recognized, "the Congress . . . has deemed it more essential to respect a man's religious beliefs than to force him to serve in the Armed Forces." Department of Defense Directive No. 1300.6 (May 10, 1968).

administrative remedies have been exhausted does not affect military discipline. For if the conscientious objector claim is valid, the Army can have no interest in punishing him for disobedience of an unlawful order. If the conscientious objector claim is invalid, then the Army can, of course, prosecute the petitioner for his alleged disobedience of a lawful order.

Correlatively, if the charges in military court would be unaffected by the validity of the conscientious objector claim, both the petitioner's habeas corpus action and the criminal trial in military court could proceed concurrently. See n. 15, *infra.* Needless to say, the question whether wrongful denial of conscientious objector status may be raised as a defense against various types of military charges must remain with the military courts, as they exercise their special function of administering military law.

[14] See generally Report of the National Advisory Commission on Selective Service, In Pursuit of Equity: Who Serves When Not All Serve? 48–51 (1967); Selective Service System Monograph No. 11, Conscientious Objection (1950); Russell, Development of Conscientious Objector Recognition in the United States, 20 Geo. Wash. L. Rev. 409 (1952); Comment, God, the Army, and Judicial Review: The In-Service Conscientious Objector, 56 Calif. L. Rev. 379 (1968).

But our decision today should not be understood as impinging upon the basic principles of comity that must prevail between civilian courts and the military judicial system. See, *e. g., Noyd* v. *Bond,* 395 U. S. 683; *Burns* v. *Wilson,* 346 U. S. 137; *Orloff* v. *Willoughby,* 345 U. S. 83; *Gusik* v. *Schilder,* 340 U. S. 128. Accordingly, a federal district court, even though upholding the merits of the conscientious objector claim of a serviceman against whom court-martial charges are pending, should give careful consideration to the appropriate demands of comity in effectuating its habeas corpus decree.[15]

*The judgment is reversed.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, concurring in the result.

I agree with the Court's view that habeas corpus is an overriding remedy to test the jurisdiction of the military to try or to detain a person. The classic case is *Ex parte Milligan,* 4 Wall. 2, where habeas corpus was issued on behalf of a civilian tried and convicted in Indiana by a military tribunal. During the Civil War all civil courts in that State were open and federal authority had always been unopposed. While the President

---

[15] In the present case the respondents acknowledge that if the administrative denial of the petitioner's conscientious objector claim had no basis in fact, then the court-martial charge against him is invalid. It follows that, if he should prevail in the habeas corpus proceeding, he is entitled to his immediate release from the military. At the other end of the spectrum is the hypothetical case of a court-martial charge that has no real connection with the conscientious objector claim—*e. g.,* a charge of stealing a fellow soldier's watch. In such a case, a district court, even though upholding the serviceman's conscientious objector claim, might condition its order of discharge upon the completion of the court-martial proceedings and service of any lawful sentence imposed.

and the Congress had "suspended" the writ, *id.,* at 115, the suspension, said the Court, went no further than to relieve the military from producing in the habeas corpus court the person held or detained. "The Constitution goes no further. It does not say after a writ of *habeas corpus* is denied a citizen, that he shall be tried otherwise than by the course of the common law; if it had intended this result, it was easy by the use of direct words to have accomplished it." *Id.,* at 126.

Mr. Chief Justice Taney in *Ex parte Merryman,* 17 F. Cas. 144 (No. 9,487) (CC Md. 1861), held that the President alone had no authority to suspend the writ, a position that Lincoln did not honor. To date, the question has never been resolved, and its decision is not relevant to the present case. I mention the matter because of the constitutional underpinning of the writ of habeas corpus. Article I of the Constitution, in describing the powers of the legislative branch, states in § 9 that: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

The Court has consistently reaffirmed the preferred place of the Great Writ in our constitutional system. *Fay* v. *Noia,* 372 U. S. 391, 400; *Smith* v. *Bennett,* 365 U. S. 708, 713.

Article III, § 1, gives Congress the power to "ordain and establish" inferior federal courts; and § 2 subjects the "appellate Jurisdiction" of this Court to "such Exceptions, and . . . such Regulations as the Congress shall make." Once Congress withdrew from this Court its appellate jurisdiction in habeas corpus cases. See *Ex parte McCardle,* 6 Wall. 318, 7 Wall. 506. An Act of Congress passed by the very first Congress provided for the issuance of the writ. But as Chief Justice Marshall said in *Ex parte Bollman,* 4 Cranch 75, 95, "for if the means be not in existence, the privilege

itself would be lost, although no law for its suspension should be enacted." It is also true that "the meaning of the term *habeas corpus*" is ascertained by resort "to the common law;" yet "the power to award the writ by any of the courts of the United States, must be given by written law." *Id.*, at 93–94.

What courts may do is dependent on statutes,[1] save as their jurisdiction is defined by the Constitution. What federal judges may do, however, is a distinct question. Authority to protect constitutional rights of individuals is inherent in the authority of a federal judge, conformably with Acts of Congress. The mandate in Art. I, § 9, that "The Privilege of the Writ . . . shall not be suspended" must mean that its issuance, in a proper case or controversy, is an implied power of any federal judge.

We have ruled that even without congressional statutes enforcing constitutional rights, the federal judges have authority to enforce the federal guarantee. *Fay* v. *New York,* 332 U. S. 261, 283–284, 285, 293; *Katzenbach* v. *Morgan,* 384 U. S. 641, 647. Those cases involved protests by individuals against state action. Certainly the military does not stand in a preferred position.

The matter is germane to the present problem. For here the military is charged with exceeding its proper bounds in seeking to punish a person for claiming his statutory and constitutional exemption from military serv-

---

[1] It has been assumed that this Court has no jurisdiction to issue an original writ of habeas corpus except when issuance of the writ has been first denied by a lower court. R. Stern & E. Gressman, Supreme Court Practice 419–420 (4th ed. 1969). But the Court has not settled the question. See *Hirota* v. *MacArthur,* 335 U. S. 876, 338 U. S. 197.

Some members of the Court have felt that, absent statutory authorization, the Court may not even transfer a petition for an original writ of habeas corpus to a lower court. But that view has not prevailed. See *Chaapel* v. *Cochran,* 369 U. S. 869.

ice.   The conflict between military prerogatives and civilian judicial authority is as apparent in this case as it was in *Ex parte Milligan*.   A person who appropriately shows that he is exempt from military duty may not be punished for failure to submit.   The question is not one of comity between military and civilian tribunals.   One overriding function of habeas corpus is to enable the civilian authority to keep the military within bounds.   The Court properly does just that in the opinion announced today.

While the Court of Military Appeals has the authority to issue the writ of habeas corpus, *Noyd* v. *Bond,* 395 U. S. 683, 695 n. 7; *Levy* v. *Resor,* 17 U. S. C. M. A. 135, 37 C. M. R. 399, we have never held that a challenge to the military's jurisdiction to try a person must first be sought there rather than in a federal district court.[2]   Of

---

[2] See *Billings* v. *Truesdell,* 321 U. S. 542.   This case involved a Selective Service registrant whose conscientious objector claim was rejected by the service.   Billings subsequently reported as ordered for induction, but refused to take the required oath.   The oath was then read to him, and he was told that his refusal to take it made no difference; he was "in the army now."   *Id.,* at 545.   When Billings refused an order to submit to fingerprinting, military charges were brought against him.

While the charges were pending, Billings sought federal habeas corpus relief, challenging the military's jurisdiction to try him, on the theory that he had not been lawfully inducted.   The District Court discharged the writ, and the Court of Appeals affirmed, but this Court held that Billings' induction had indeed violated existing statutory law, and ordered that the writ issue.   Implicit in this holding is an affirmation of the proposition that exhaustion of military remedies, including pending court-martial, is not required of one challenging the military's jurisdiction to try him in the first instance.

While *Billings* was decided before the enactment of the Uniform Code of Military Justice, cases decided under the Code have reached similar results.   See, *e. g., McElroy* v. *Guagliardo,* 361 U. S. 281; *Reid* v. *Covert,* 354 U. S. 1; *Toth* v. *Quarles,* 350 U. S. 11.

*Noyd* v. *Bond,* 395 U. S. 683, is not to the contrary.   There, the Court was faced with a serviceman who had refused to obey an order

course, where comity prevails, as it does between state and federal courts, federal habeas corpus will be denied where state habeas corpus or a like remedy is available but has not been utilized. *Ex parte Hawk,* 321 U. S. 114. A petitioner must, indeed, pursue his alleged state remedies until it is shown that they do not exist or have been futilely invoked.

The principle of comity was invoked by Congress when it wrote in 28 U. S. C. § 2254 that federal habeas corpus shall not be granted a person in state custody "unless it appears that the applicant has exhausted the remedies available in the courts of the State." That principle of comity is important in the operation of our federal system, for both the States and the Federal Government

because of his asserted conscientious scruples against the war in Vietnam. His court-martial conviction was pending in the Court of Military Appeals. The issue decided against him on his federal habeas application, however, was not the jurisdiction of the military to try him in the first instance, but merely his entitlement to bail pending disposition of his military appeals. The Court held that his bail motion should first be presented to the Court of Military Appeals; but we were explicit in distinguishing *Guagliardo, Covert,* and *Toth:*

"The cited cases held that the Constitution barred the assertion of court-martial jurisdiction over various classes of civilians connected with the military, and it is true that this Court there vindicated complainants' claims without requiring exhaustion of military remedies. We did so, however, because we did not believe that the expertise of military courts extended to the consideration of constitutional claims of the type presented. Moreover, it appeared especially unfair to require exhaustion of military remedies when the complainants raised substantial arguments denying the right of the military to try them at all. Neither of these factors is present in the case before us." 395 U. S., at 696 n. 8.

Thus, *Noyd* supports the proposition that "exhaustion is not required when a prisoner challenges the personal jurisdiction of the military." Developments in the Law—Federal Habeas Corpus, 83 Harv. L. Rev. 1038, 1233 n. 169. And Parisi's challenge is precisely of that nature.

are administering programs relating to criminal justice.[3]
See *Fay* v. *Noia,* 372 U. S. 391. But "the principles of
federalism which enlighten the law of federal habeas
corpus for state prisoners are not relevant," *Noyd* v.
*Bond,* 395 U. S., at 694, to analogous questions involving
military prisoners. Military proceedings are different.
As we said in *O'Callahan* v. *Parker,* 395 U. S. 258, 265,
"A court-martial is not yet an independent instrument
of justice but remains to a significant degree a specialized
part of the overall mechanism by which military disci-
pline is preserved."

Comity is "a doctrine which teaches that one court
should defer action on causes properly within its juris-
diction until the courts of another sovereignty with con-
current powers, and already cognizant of the litigation,
have had an opportunity to pass upon the matter." *Darr*
v. *Burford,* 339 U. S. 200, 204. But the Pentagon is not
yet sovereign. The military is simply another adminis-
trative agency, insofar as judicial review is concerned.
Cf. Comment, 43 S. Cal. L. Rev. 356, 377–378. While
we have stated in the past that special deference is due
the military decisionmaking process, *Gusik* v. *Schilder,*
340 U. S. 128, this is so neither because of "comity," nor
the sanctity of the Executive Branch, but because of a
concern for the effect of judicial intervention on morale
and military discipline, and because of the civilian judi-
ciary's general unfamiliarity with "extremely technical
provisions of the Uniform Code [of Military Justice]
which have no analogs in civilian jurisprudence," *Noyd* v.
*Bond, supra,* at 696.

---

[3] As Irving Brant says in the Bill of Rights 483 (1965), "the
essential differences between state and federal criminal law, though
immense in subject matter, have little bearing on 'fundamental fair-
ness' or 'basic liberties.' These are involved when overlapping
jurisdictions produce double jeopardy, but the fundamentals of fair-
ness are not different in state and federal courts."

The "special expertise" argument is often employed by the defenders of the military court system. Thus, the argument was advanced—and rejected—that the civilian judges who were to staff the Court of Military Appeals could not do service, absent military experience, to the complicated, technical niceties of military law.[4] See,

---

[4] Many of today's critics of the Court of Military Appeals feel. that an insensitivity to military needs is the least of the court's problems. Recent attacks have rested on the premise that, in fact, the court has become too closely identified with the viewpoint of the military establishment it is supposed to oversee. See, e. g., R. Sherrill, Military Justice Is to Justice as Military Music Is to Music 214–215 (1970). Critics must concede, however, that the court has at least been partially successful in infusing civilian notions of due process into the military justice system. See, e. g., E. Sherman, Justice in the Military, in Conscience and Command 21, 28 (J. Finn ed. 1971). Thus, the court has extended to servicemen the right to a speedy trial, United States v. Schalck, 14 U. S. C. M. A. 371, 34 C. M. R. 151; the right to confront witnesses, United States v. Jacoby, 11 U. S. C. M. A. 428, 29 C. M. R. 244; the right to protection against unreasonable searches and seizures, United States v. Vierra, 14 U. S. C. M. A. 48, 33 C. M. R. 260; the privilege against self-incrimination, United States v. Kemp, 13 U. S. C. M. A. 89, 32 C. M. R. 89; the right to a public trial, United States v. Brown, 7 U. S. C. M. A. 251, 22 C. M. R. 41; the right to compulsory service of process, United States v. Sweeney, 14 U. S. C. M. A. 599, 34 C. M. R. 379; and the right to Miranda-type warnings, United States v. Tempia, 16 U. S. C. M. A. 629, 37 C. M. R. 249.

Despite these advances, however, the military justice system's disregard of the constitutional rights of servicemen is pervasive. See Hearings on Constitutional Rights of Military Personnel before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, pursuant to S. Res. No. 260, 87th Cong., 2d Sess.; Joint Hearings on S. 745 et al. before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary and a Special Subcommittee of the Senate Armed Services Committee, 89th Cong., 2d Sess., pts. 1 and 2. See also Summary-Report of Hearings on Constitutional Rights of Military Personnel, by the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, pursuant to S. Res. No. 58, 88th Cong., 1st Sess. (Comm. Print 1963).

*e. g.,* 96 Cong. Rec. 1305–1306. But civilian courts must deal with equally arcane matters in such areas as patent, admiralty, tax, antitrust, and bankruptcy law, on a daily basis.

Our system of specialized military courts, though "necessary to an effective national defense establishment," *O'Callahan* v. *Parker,* 395 U. S., at 265, has roots in a system almost alien to the system of justice provided by the Bill of Rights, by Art. III, and by the special provision for habeas corpus contained in Art. I, § 9. Military law is primarily an instrument of discipline and a "military trial is marked by the age-old manifest destiny of retributive justice." *Id.,* at 266.[5] For the sake of discipline and orderliness a person in the military service must normally follow the military administrative procedure and exhaust its requirements. *Gusik* v. *Schilder,* 340 U. S. 128. But once those administrative remedies are exhausted, he must then be permitted to resort to civilian courts [6] to make sure that the military regime acts

---

[5] At the hearings on the proposed Uniform Code of Military Justice, one witness analogized the military court-martial panel to a jury appointed by the sheriff's office. Hearings on the Uniform Code of Military Justice before a Subcommittee of the House Committee on Armed Services, 81st Cong., 1st Sess., 630 (1949). Rep. Sutton of Tennessee, himself a much-decorated veteran, summarized his views on the state of military justice during World War II by his statement, during the floor debates on the proposed Code, that "[h]ad they used the Pentagon Building for what it was designed, a veteran's hospital, America would have been lots better off today." 95 Cong. Rec. 5727.

[6] The Federal Rules of Civil Procedure govern habeas corpus (Rule 81 (a)(2)), that remedy being civil in nature; and those Rules are comprehensive, including depositions and discovery. Rules 26–37.

The Rules of Practice and Procedure of the Court of Military Appeals (see the Rules ff. 10 U. S. C. A. § 867, Supp. 1972) contain no provisions respecting habeas corpus.

While collateral remedies have been recognized by the Court of Military Appeals since 1966, *United States* v. *Frischholz,* 16 U. S. C. M. A. 150, 36 C. M. R. 306, and the express power to grant habeas

within the scope of statutes governing the problem and any constitutional requirements. To repeat, both statutes[7] and the Constitution[8] are implicated in the claims of conscientious objectors.

Petitioner claims to be a conscientious objector and therefore not subject to military orders. He was charged with refusing to obey a military order sending him to Vietnam and has been convicted of that offense. While the court-martial charges against him were pending, he exhausted all administrative remedies for relief from the Army's denial of his conscientious objector application. In theory he could pursue his remedies within the military system by appealing the conviction or seeking habeas corpus in the Court of Military Appeals. But he need go no further than to exhaust his administrative remedies for overruling the decision that he was not a conscientious objector. If there is a statutory or constitutional reason why he should not obey the order of the Army, that agency is overreaching when it punishes him for his refusal.

The Army has a separate discipline of its own and obviously it fills a special need. But matters of the mind and spirit, rooted in the First Amendment, are not in the

corpus relief was asserted in 1967, *Levy* v. *Resor*, 17 U. S. C. M. A. 135, 37 C. M. R. 399, the military prisoner is at a substantial disadvantage compared to his civilian counterpart. See Uniform Code of Military Justice, Arts. 32, 36, 46, and 49, 10 U. S. C. §§ 832, 836, 846, and 849. See Melnick, The Defendant's Right to Obtain Evidence: An Examination of the Military Viewpoint, 29 Mil. L. Rev. 1 (1965). See generally M. Comisky & L. Apothaker, Criminal Procedure in the United States District and Military Courts (1963). And see Manual for Courts-Martial, ¶¶ 30f, 34, 115, 117, and 145a (1968).

[7] 50 U. S. C. App. § 456 (j). See *United States* v. *Seeger*, 380 U. S. 163.

[8] See *Gillette* v. *United States*, 401 U. S. 437, 463 (DOUGLAS, J., dissenting).

keeping of the military. Civil liberty and the military regime have an "antagonism" that is "irreconcilable." *Ex parte Milligan,* 4 Wall., at 124, 125. When the military steps over those bounds, it leaves the area of its expertise and forsakes its domain.[9] The matter then becomes one for civilian courts to resolve, consistent with the statutes and with the Constitution.

---

[9] Another factor militating against the Court's reliance on "comity" in analyzing the insulation of the military justice system from civilian review is the enormous power of the military in modern American life.

"From an initial authorized strength of well under one thousand, our army alone has grown into a behemoth numbering well over a million men even in time of nominal peace. No longer does the military lie dormant and unnoticed for years on end, coming to the attention of the typical citizen only in time of war. Today every male resident is a potential soldier, sailor, or airman; and it has been estimated that even in time of peace such service occupies at least four percent of the adult life of the average American reaching draft age. As Mr. Chief Justice Warren recently observed:

" 'When the authority of the military has such a sweeping capacity for affecting the lives of our citizenry, the wisdom of treating the military establishment as an enclave beyond the reach of the civilian courts almost inevitably is drawn into question.' [Warren, The Bill of Rights and the Military, 37 N. Y. U. L. Rev. 181, 188.]"

Comment, God, the Army, and Judicial Review: The In-Service Conscientious Objector, 56 Calif. L. Rev. 379, 446–447.