Katherine **JASHINSKI** Petitioner

v.

LTC Barbara **HOLCOMB**, Commander, Special Troops Battalion, Ft. Sam Houston, Texas, and CPT Martin O'Donnell, Commander, Headquarters Company, Special Troops Battalion, Ft. Sam Houston, Texas Respondents.

No. Civ.A. SA05CA1073OG.

United States District Court, W.D. Texas, San Antonio Division.

March 3, 2006.

---

Paul Schlaud, Beverly G. Reeves, Reeves & Brightwell, LLP, Austin, TX, for Plaintiff.

Harold E. Brown, Jr., Assistant U.S. Attorney, San Antonio, TX, for Defendant.

## ORDER

GARCIA, District Judge.

On November 2, 2005, Petitioner, Katherine Jashinski, filed a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2241, seeking to reverse the Department of the Army's decision to deny her request for status as a conscientious objector and discharge from the armed services.[1] Ms.

1. Dkt. No. 1.

Jashinski (hereinafter "Petitioner" or "Specialist Jashinski") received activation orders for deployment to Afghanistan on Saturday, November 12, 2005, and filed a motion for temporary restraining order and preliminary injunction.[2] The Respondents filed a response to the motion for temporary restraining order and a brief in opposition to the petition for writ of habeas corpus.[3] The administrative record from the Department of the Army was also filed.[4] The Court held a hearing, and heard arguments of counsel.[5] After reviewing the record and considering the arguments of counsel, the Court determined that Petitioner's motion for temporary restraining order should be denied. Thereafter, Petitioner filed her traverse to the Respondents' response, and the Respondents filed a reply.[6] After further review of the record and the applicable law, the Court finds that all relief sought in the petition for writ of habeas corpus should be denied.

### Factual background and administrative history

On or about April 20, 2002, Petitioner voluntarily enlisted in the Army National Guard and as a Reserve of the United States Army for a period of eight years.[7] As part of her enlistment contract, Specialist Jashinski agreed that she would be required to undergo basic weapons qualification and individual weapons training as necessary; however, she would not be assigned to a unit or position whose primary mission would be combat.[8] She would receive over $8,000 in bonus pay and tuition benefits pursuant to the Montgomery GI Bill and Student Loan Repayment Program.[9] The enlistment agreement also included several questions, including the following:

> Are you now or have you ever been a conscientious objector? (That is, do you have, or have your ever had, a firm, fixed and sincere objection to participation in war in any form or to the bearing of arms because of religious belief or training?)

Specialist Jashinski answered this question "No." [10]

Specialist Jashinski was assigned to the Headquarters Company of the 111th Area Support Group of the Texas Army National Guard.[11] On or about April 9, 2004, she received activation orders for deployment to Afghanistan.[12] On June 1, 2004, Specialist Jashinski requested a discharge based on conscientious objection.[13] A formal application for CO status was submitted on August 5, 2004, and the administrative process of review began.[14]

On August 20, 2004, Army chaplain Lieutenant Colonel Steve Vaughn interviewed Specialist Jashinski.[15] His report states, in part, that Specialist Jashinski was "forced to re-evaluate her beliefs relative to war and being in the military" when

2.  Dkt. No. 3.

3.  Dkt. Nos. 4, 5.

4.  *See* Dkt. Nos. 5, 9.

5.  Dkt. No. 6.

6.  Dkt. Nos. 7, 8.

7.  Administrative Record (hereinafter "AR") at 209–210.

8.  AR at 213.

9.  AR at 219.

10.  AR at 218.

11.  AR at 221.

12.  Dkt. No. 1 at p. 5.

13.  AR at 173; 222–227

14.  AR at 221–227.

15.  AR at 167–172.

her unit was activated in April and that she concluded that she could no longer serve in the military.[16] On September 29, 2004, as part of the administrative process, Specialist Jashinski received a mental status evaluation.[17] The clinical psychologist evaluating her concluded that there was no evidence of any mental defect, emotional illness or psychiatric disorder, and that Specialist Jashinski was able to participate intelligently in the ongoing administrative proceedings.[18]

On October 28, 2004, Lieutenant Colonel Marvin Miller was appointed as investigating officer to review the CO application and provide a recommendation.[19] He conducted a hearing on November 7, 2004 to interview the applicant, and he reviewed all of the written documentation contained in the record.[20] On November 23, 2004, the investigating officer recommended that Specialist Jashinski be denied CO status because she did not make any claim of conscientious objection until after her unit had received activation orders and she was taking no supportable actions in support of her new beliefs.[21] Specialist Jashinski submitted a written rebuttal to the recommendation on December 15, 2004.[22] At or about the same time, she received orders to report for duty with her unit at Fort Sam Houston in San Antonio.[23]

In January 2005, Specialist Jashinski reported for active duty with her unit at Fort Sam Houston.[24] On February 17, 2005, Major General Daniel Densford reviewed the CO application and accompanying information and recommended disap-

proval of the application.[25] On or about March 7, 2005, Specialist Jashinski's unit was deployed to Afghanistan, but she was allowed to remain at Fort Sam Houston because her CO application was still pending.[26] On March 11, 2005, Colonel Joyce L. Stevens recommended that Specialist Jashinski be granted CO status *and* deployed to Afghanistan with the rest of her unit, which was already in theater. She further stated:

> I believe that the Area Support Group mission is in total alignment with her convictions of making the world a better place, assisting people that are less fortunate and bringing that nation's quality of life into the 21st century. The Area Support Group has a Base Operations mission and among its duties the Group works to contribute to a free, democratic Afghanistan, provide supplies and accomplish projects like well and school construction, play a role in economic development, etc. SPC Jashinski would be able to participate on base without carrying a weapon.

> If SPC Jashinski receives [CO] status and refuses to deploy, or if it is determined that she is not a[CO] and she refuses to deploy, I recommend that she be prosecuted and that she ultimately spend double the unit's deployment time (the unit's scheduled deployment is for one year) in a correctional facility.[27]

This recommendation was legally insufficient because CO status could be granted and SPC Jashinski could be discharged, *or*

---

16. AR at 168.

17. AR at 194.

18. *Id.*

19. AR at 72.

20. AR at 187.

21. *Id.*

22. AR at 157–166.

23. Dkt. No. 1, p. 8.

24. *Id.*

25. AR at 37.

26. Dkt. No. 1, p. 8.

27. AR at 35.

CO status could be denied and she could re-join her unit, but not both.[28] Thus, Colonel Stevens was requested to re-evaluate her recommendation.[29] On April 24, 2005, Colonel Stevens corrected her recommendation, stating that SPC Jashinski "not be granted [CO] status and deploy with her unit to Afghanistan, which is now in theater."[30] She also reiterated that the unit's mission in Afghanistan was to provide humanitarian aide and assist in economic development, which "would in no way interfere with [Specialist Jashinski's] beliefs."[31] On May 26, 2005, Major General Wayne D. Marty also reviewed the CO application and accompanying information, and recommended that the application be denied.[32] Like Colonel Stevens, he noted that the unit's mission was "in perfect alignment" with Specialist Jashinski's convictions of "making the world a better place and aiding people at risk."[33] During this time period, the file was reviewed at least twice for completeness and legal sufficiency, and finally forwarded to the Department of the Army Conscientious Objector Review Board ("DACORB") for a decision.[34] On July 6, 2005, the Board determined that the application for CO status should be denied, finding that Specialist Jashinski had not presented clear and convincing evidence of conscientious objection to war of any kind.[35]

On July 21, 2005, Specialist Jashinski filed a petition for writ of habeas corpus in this Court.[36] However, the parties conferred and agreed that Specialist Jashinski should have been provided the opportunity to submit a rebuttal to the commanding officers' recommendations of denial prior to the DACORB's consideration of her case. The parties therefore agreed to a dismissal without prejudice, and the case was reopened at the administrative level.[37]

On September 9, 2005, Specialist Jashinski submitted her second rebuttal for the Board's review.[38] The DACORB then reviewed the case again, and the CO application was denied on October 6, 2005.[39] In the Board's opinion, Specialist Jashinski did not prove by clear and convincing evidence that she was a conscientious objector.[40]

### Jurisdiction

The petition in the instant case was filed on November 2, 2005 after all administrative remedies were exhausted.[41] Petitioner was on active duty and stationed at Fort Sam Houston in San Antonio at the time her petition was filed.[42] She subsequently received orders to report for duty at Ft. Benning, Georgia where her unit would undergo training exercises in preparation for overseas duty in Afghanistan. Respondents, who are officers in her chain

28. *See* 32 C.F.R. § 75.5(d),(e).

29. AR at 25, 27.

30. AR at 20.

31. *Id.*

32. AR at 18.

33. *Id.*

34. AR at 22–23; 29–31.

35. AR at 239–241.

36. *See Katherine Jashinski v. J. Francis Harvey, Secretary of the Army, et. al.,* Civil Action No. 05–CA–675, in the United States District

Court, Western District of Texas, San Antonio Division.

37. *See id.,* Dkt. No. 8.

38. AR at 4–18.

39. AR at 1–3.

40. AR at 3.

41. Dkt. No. 1.

42. *Id.*

of command, were also stationed at Fort Sam Houston in San Antonio at the time the petition was filed.[43]

A member of the Armed Forces on active duty is "in custody" within the meaning of 28 U.S.C. § 2241 so as to support federal habeas corpus jurisdiction.[44] There is a requirement that the petitioner be "in custody" within the territorial jurisdiction of the court hearing the matter; however, federal courts have consistently held that the court's jurisdiction does not cease to exist simply because the soldier may be involuntarily moved *after* the filing of the petition.[45] Thus, the Court has jurisdiction to determine the merits of this matter.[46]

### Legal analysis

**A. Legal framework for the conscientious objector claim**

In 1962, the Department of Defense issued Directive 1300.6, which extended the congressionally approved conscientious objector exemption for pre-induction personnel to in-service members of the Armed Forces by providing for administrative discharge on grounds of conscientious objec-tion.[47] Pursuant to DOD Directive 1300.6, the various branches of the Armed Forces also implemented their own regulations to establish specific procedures for each department.[48] DOD Directive 1300.6, after certain amendments, is currently published under 32 C.F.R. §§ 75.1–75.11, and a current version of Army Regulation 600–43, which provides uniform standards for processing conscientious objector applications during mobilization, was provided to the Court by counsel for Respondents.[49]

The regulations define *conscientious objection* as "a firm, fixed and sincere objection to participation in war in any form or the bearing of arms, by reason of religious training and belief." [50] The burden of establishing a claim of conscientious objection is on the applicant, and she must establish by *clear and convincing evidence* that the basis of her claim comes within the criteria for conscientious objection and that her belief in connection therewith is honest, sincere and deeply held.[51]

*War in any form* means *all* wars rather than a specific war.[52] An individual who desires to choose the war in which she will

---

**43.** *Id.*

**44.** *Parisi v. Davidson,* 405 U.S. 34, 39, 92 S.Ct. 815, 818, 31 L.Ed.2d 17 (1972) ("writ of habeas corpus has long been recognized as the appropriate remedy for servicemen who claim to be unlawfully retained in the armed forces").

**45.** *See Miller v. Laird,* 474 F.2d 999, 1000 (5th Cir.1973) (the petitioner was located at Fort Sam Houston in San Antonio, and subject to the custody of the Commanding General of the Fifth U.S. Army at the time his petition was filed; thus, jurisdiction was proper in Western District of Texas); *see also Smith v. Campbell,* 450 F.2d 829, 834 (9th Cir.1971) (petitioner and his commanding officer were ordered to duty in Australia one month after filing petition in Eastern District of California; the district court was not divested of jurisdiction and could determine the merits).

**46.** *See Pitcher v. Laird,* 421 F.2d 1272, 1277 (5th Cir.1970) (where court-martial or military justice procedures are not pending, and all administrative procedures have been exhausted, the Court has jurisdiction to hear the petition for writ of habeas corpus).

**47.** *Pitcher,* 421 F.2d at 1277; Paul G. Reiter, Annotation, *Discharge from Armed Forces on ground of conscientious objection,* 10 ALR Fed. 15 § 1 (1972).

**48.** Reiter, *supra* note 47, § 3(c).

**49.** *See* Dkt. # 4 (Army Reg. 600–43 referred to as D Exh. "A").

**50.** 32 C.F.R. § 75.3(a).

**51.** 32 C.F.R. § 75.5(d) (emphasis added).

**52.** 32 C.F.R. § 75.5(b)(1) (emphasis added).

participate is not a conscientious objector.[53]

*Religious training and belief* includes a moral or ethical belief that the applicant may not characterize as "religious" in the traditional sense; however, it must be "a sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of another," and not merely "a belief which rests solely upon considerations of policy, pragmatism, expediency or political views." [54] The applicant must show that her convictions, once acquired, have directed her life "in the way traditional religious convictions of equal strength, depth and duration have directed the lives of those whose beliefs are clearly found in traditional religious convictions.[55] In other words, the belief upon which conscientious objection is based must be the primary controlling force in the applicant's life." [56]

"A primary factor to be considered is the sincerity with which the belief is held, [and][g]reat care must be exercised in seeking to determine whether asserted beliefs are honestly and genuinely held." [57] "Sincerity is determined by an impartial evaluation of the applicant's thinking and living in its totality, past and present." [58] The actions as well as the views of the applicant are carefully examined and given substantial weight.[59]

There are two classes of conscientious objectors. A *class 1–O conscientious objector* is a member who, by reason of conscientious objection, sincerely objects to participation of any kind in war in any form.[60] A *class 1–A–O conscientious objector* is a member who, by reason of conscientious objection, sincerely objects to participation as a combatant in war in any form, but whose convictions are such as to permit military service in a noncombatant status.[61] When applying for CO status, the soldier must designate whether she is seeking classification as a 1–O conscientious objector (discharge) or a 1–A–O conscientious objector (non-combatant duty), and "[a]n applicant claiming 1–O status shall not be granted 1–A–O status as a compromise." [62]

In this case, Petitioner requested 1–O classification as a conscientious objector, and sought to be discharged from the Armed Forces.[63] While she notes in her petition that at least one of the commanding officers recommended, in part, that she be placed in a non-combat duty position, she did not apply for reassignment and the DACORB properly dismissed the recommendation because granting A–1–O status as a compromise is not allowed under the regulations.[64] After reviewing the record and applying the legal criteria outlined above, the DACORB determined that Petitioner had not met her burden of proving by clear and convincing evidence that her beliefs warranted an award of 1–O status.[65]

53. *Id.*

54. 32 C.F.R. § 75.3(b).

55. *See Welsh v. United States,* 398 U.S. 333, 343, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970).

56. 32 C.F.R. § 75.5(c)(1).

57. 32 C.F.R. § 75.5(c)(2); *see also Silverthorne v. Laird,* 341 F.Supp. 443, 448 (W.D.Tex.1972) ("Sincerity is sine qua non of every claim to conscientious objection").

58. 32 C.F.R. § 75.5(c)(2).

59. 32 C.F.R. § 75.5(c)(2)(i).

60. 32 C.F.R. § 75.3(a)(1).

61. 32 C.F.R. § 75.3(a)(2).

62. 32 C.F.R. § 75.5(d),(e).

63. AR at 221–227.

64. *See* 32 C.F.R. § 75.5(d),(e).

65. AR at 1–3.

### B. Justiciability of petitioner's claim

■ The Respondents assert that Petitioner's claim is non-justiciable. Thus, the Court must determine the issue of justiciability before it undertakes a review of the merits.

Respondents rely on the 1971 *Mindes* decision, wherein the Fifth Circuit opined that federal courts should not review internal military affairs in the absence of (a) an allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations, and (b) exhaustion of available intraservice corrective measures.[66] The *Mindes* opinion also discusses additional factors to consider prior to reviewing the merits of a challenge to a military decision.[67]

The Court respects the authority of the Armed Forces to organize, arm and discipline all military personnel, and the Court recognizes the importance of judicial restraint when dealing with military decisions. However, the *Mindes* case was *not* a habeas corpus action involving a conscientious objector claim, and the Supreme Court has expressly stated:

> When a member of the armed forces has applied for a discharge as a conscientious objector and has exhausted all avenues of administrative relief, it is now settled that he may seek habeas corpus relief in a federal district court on the

ground that the denial of his application had no basis in fact.

*Parisi v. Davidson,* 405 U.S. 34, 35, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972). Moreover, it does not appear that any habeas corpus actions involving conscientious objector claims in the Fifth Circuit have been dismissed as non-justiciable under the *Mindes* doctrine for the reasons suggested herein.[68] A conscientious objector claim, by its very nature, involves a challenge to the Armed Forces' application of their own regulations, and as long as administrative remedies have been exhausted, federal courts have consistently recognized the right to seek collateral review of the denial of discharge. Thus, while the Court does not enjoy or possess the same knowledge or expertise as the Department of the Army in matters of military management, the Court does find that Specialist Jashinski's claim is subject to judicial review for the reasons stated above.

### C. Standard of review

■ In reviewing the Board's decision, the Court is bound to the narrowest standard of review under the law: whether there is any basis in fact for the Army's decision.[69] The Court cannot re-weigh the evidence or substitute its own judgment for that of the DACORB. Instead, the Court must simply review the administrative record to determine whether the record contains facts which support the DACORB's decision.

---

**66.** *Mindes v. Seaman,* 453 F.2d 197, 201 (5th Cir.1971).

**67.** Those factors include: (1) the nature and strength of the plaintiff's challenge to the military determination; (2) the potential injury to the plaintiff if review is refused; (3) the type and degree of anticipated interference with the military function; and (4) the extent to which the exercise of military expertise or discretion is involved. *Id.* at 201–202.

**68.** Respondents assert that Petitioner's CO claim is "weak" and "tenuous at best." Dkt. No. 8, pp. 9–10. This argument obviously focuses more on the merits of the claim than principles of comity and judicial restraint.

**69.** *Estep v. United States,* 327 U.S. 114, 122, 66 S.Ct. 423, 90 L.Ed. 567 (1946); *Hopkins v. Schlesinger,* 515 F.2d 1224, 1228 (5th Cir. 1975); *Silverthorne v. Laird,* 460 F.2d 1175, 1179 (5th Cir.1972).

## D. The Board's conclusions and the Court's review thereof

The DACORB is comprised of three members: the Board President, a Chaplain and a representative from the Office of the Staff Judge Advocate. After reviewing the entire record and evaluating the facts under the criteria necessary for CO status, the Board denied Specialist Jashinski's request for discharge, and further noted:[70]

NOTES FROM THE SJA:

Application does not prove by clear and convincing evidence that the applicant is a conscientious objector. Applicant has not met the burden of proof because there is little evidence, other than applicant's statement, that indicates CO status.

NOTES FROM THE CHAPLAIN:

SPC Jashinski has not demonstrated [by] clear, fix[ed], firm and convincing evidence that she meets the requirements of conscientious [objector] status. No evidence of a crystallize[d] belief of CO.

NOTES FROM THE PRESIDENT:

SPC Jashinski has not provided clear and convincing fixe[d] evidence of meeting the requirements to be classified a conscientious objector. The timing of the application after unit alerted for deployment has also cast a shadow of doubt on the evidence submitted.

The Court must now determine, by reviewing the record, whether there is any basis in fact for the Board's decision.

■ Perhaps the most glaring fact is the timing of Specialist Jashinski's application and the "shadow of doubt" that it cast on the sincerity of her beliefs. Specialist Jashinski enlisted in April 2002, and it was not until she received activation orders for deployment to Afghanistan in April 2004 that she "began to question [her] participation in the military."[71] One month later, in May 2004, Petitioner claims to have "become a *complete* conscientious objector."[72] She informed her chain of command in June 2004.[73] While the timing of a CO application cannot be the sole reason for denial of an application, the Fifth Circuit has also recognized:

We think that in reviewing the sincerity of claimed conscientious objectors the Army can legitimately consider the fact that the application comes on the eve of deployment of the claimant to a combat zone. A contrary holding would run counter to all that we know about the instinct for self-preservation. Indeed we have held that in conscientious objector cases any fact which casts doubt on the veracity and sincerity of the applicant can be considered, and that the time of the application is such a fact.

*Rothfuss v. Resor*, 443 F.2d 554, 558 (5th Cir.1971).[74] In this case, the fact that Specialist Jashinski did not question her participation in the military until she received activation orders clearly raised substantial doubt as to whether her beliefs were sincere, as defined under the regulations.

---

**70.** AR at 3.

**71.** AR at 4; *see also* AR at 48 ("Applicant states she *began* thinking about this last April when her unit got activated."); *see also* AR at 106 ("While she was clearly tired of military life, she did not fully realize the mutually exclusive nature of her beliefs and the military until she was called upon to serve overseas").

**72.** AR at 12 (emphasis added).

**73.** AR at 82.

**74.** *See also Hopkins*, 515 F.2d at 1228; *De-Walt v. Commanding Officer, Fort Benning, Ga.*, 476 F.2d 440, 442 (5th Cir.1973).

The sincerity of her beliefs was also clouded by the ambiguous nature of Petitioner's statements and actions. Although Petitioner states that she vehemently opposes the bearing of arms, the record reflects that she willingly participated in firearm drills at the M16 firing range in May 2004—the same month she allegedly became a "complete conscientious objector." [75]

When Petitioner was initially interviewed by a chaplain, she was questioned about the manner in which her beliefs were exhibited in her daily life. Petitioner responded by stating that she was riding a bicycle rather than driving a car and she had become a vegetarian.[76] When later questioned by the investigating officer, she stated that she was not involved in any organized activities and did not believe that she could "do humanitarian things as a member of the military." [77] Finally, in her second written rebuttal, Petitioner noted that she was helping to start a counseling hotline for military personnel and that she had attended a demonstration on the anniversary of the nuclear bombings of Hiroshima and Nagasaki.[78] However, Petitioner offered very little evidence to show that her beliefs were strong enough to govern her actions in "both word and deed," which is an important part of the "sincerity" analysis.[79]

There is also factual support in the record for the Board's determination that Petitioner failed to prove, by clear and convincing evidence, that her alleged beliefs as a conscientious objector had "crystal-lized." It certainly appears that Petitioner experienced a tremendous amount of social, political and environmental awareness during the time frame in question, and she was greatly influenced by the views of those around her; however, Petitioner's own ideas and opinions appeared to be rapidly changing and evolving, rather than "firm and fixed." [80] In her second rebuttal, Petitioner spoke of a "life-altering experience" a little over a year before she applied for discharge, when she abandoned her past moral, ethical and religious beliefs and began rebuilding her own moral code.[81] She described how she "came into contact with new ideas and beliefs" in discussions with others, and was "receptive to this influx of ideas concerning the immorality of war." [82] She "read the news and focused on the current war" and "began to question the reasons used to justify any and all wars." [83] Even after deciding that she was a conscientious objector, Petitioner "struggled with [the] dilemma" of whether she should participate in war.[84] These facts, as well as the record as a whole, support the Board's finding that Petitioner did not prove by clear and convincing evidence that she had a "firm, fixed and sincere objection" to participation in war in any form.

As the Respondents also note, it is clear that Petitioner objects to the current military conflict, but the evidence showing that she objects to *all* war, in any form, is not clear and convincing. Most of the events which triggered Petitioner's new ideas relating to war and peace revolve around her

---

75. AR at 11, 164, 296.

76. AR at 22, 49.

77. AR at 83–84.

78. AR at 12.

79. 32 C.F.R. § 75.5(c).

80. *See* AR at 5 ("I was growing up and finding out who I was and what I stood for").

81. AR at 5.

82. *Id.*

83. AR at 5–6.

84. AR at 6.

conversations with other people about the war in Iraq and the United States' current military operations in other parts of the world. In her rebuttal, Petitioner explained:

> In December and January of 2003–04, I traveled to the Sough Pacific with my best friend. Here I was engaged in conversation about the U.S. and its military forces throughout the world ... I was exposed to attitudes and opinions of the U.S. military's involvement, that I had not been exposed to previously. I found myself defending the actions of the U.S. with weak arguments because I was not conversant on the matter.

AR at 5; *see also* AR at 112. She further stated that she "read the news and focused on the current war,"[85] and that "[a]s [she] watched the war from [her] television and computer, [she] became more and more skeptical of it."[86] She later "attended meetings to discuss withdrawal strategies from Iraq."[87] While Petitioner also states that she became conscientiously opposed to *all* war in *any* form, such evidence is less than clear and convincing in light of the manner in which her new thoughts and ideas developed.

Finally, the Court must agree with Respondents' characterization of Petitioner's views as "pragmatic," rather than deeply held moral and ethical beliefs held with the strength and devotion of traditional religious conviction.[88] In her discharge application, Petitioner stated that she believe[d] that every situation can be handled with peaceful diplomacy and non-violent resistance.[89] When interviewed by the chaplain, Petitioner described her position by stating that "war is unnecessary," or "war is not working," and "we can come up with better ways that do not end in death."[90] These views developed primarily through conversations with friends during a relatively brief period of time when Petitioner was being saturated with an "influx of ideas" that she had never been exposed to before, and after she had abandoned the moral and ethical values that had been instilled in her throughout the previous 19 years.[91] These views are pragmatic in nature, rather than the sort of deeply held moral and ethical beliefs that are developed through activity comparable in rigor and dedication to the process by which traditional religious convictions are formulated.

### Conclusion

 Based on the record herein, the Court finds that there is a "basis in fact" for the Army's decision to deny Specialist Jashinski's application for discharge based on conscientious objection.

It is therefore ORDERED that all relief requested in the petition for writ of habeas corpus is hereby DENIED.

---

85. AR at 5.

86. AR at 63.

87. AR at 12.

88. *See* 32 C.F.R. § 75.3(b)("The term 'religious training and belief' does not include a belief which rests solely upon considerations of policy, pragmatism, expediency, or political views").

89. AR at 287.

90. AR at 167.

91. AR at 5–6; 159–161.