UNITED STATES of America ex rel. Neil OKERLUND, Petitioner-Appellee,

v.

Melvin R. LAIRD, as Secretary of Defense, et al., Respondents-Appellants.

No. 71–1523.

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1972.

Decided Jan. 12, 1973.

Rehearing En Banc Denied Feb. 22, 1973.

James R. Thompson, U. S. Atty., Mary L. Sfasciotti, Asst. U. S. Atty., Chicago, Ill., for respondents-appellants.

Anthony J. Murray, Jr., Chicago, Ill., for petitioner-appellee.

Before KNOCH, Senior Circuit Judge, PELL, Circuit Judge, and DURFEE, Senior Judge, United States Court of Claims.*

PELL, Circuit Judge.

This is an appeal from a district court judgment granting a writ of habeas corpus to Neil Okerlund and ordering the United States Army to give him an honorable discharge.

Okerlund had enlisted in the Army for a three-year term in June 1969. Following basic training, he was assigned, pursuant to his request, as a bandsman at Fort Sheridan. In July 1970, he was informed by his sergeant that he would probably be ordered to Vietnam in the near future. Immediately thereafter Okerlund began the preparation of an application for discharge from the armed services as a conscientious objector. The tour of duty in Vietnam would have involved no combatant activity but, in addition to bandsman duties such as he had undertaken at Fort Sheridan, he would have been required to do some guard duty.

In his application for discharge, Okerlund pointed out that a great many of his band duties dealt with public relations of a non-military nature and that he was permitted to live off the post with his wife and for the most part to

---

* Senior Judge James R. Durfee of the United States Court of Claims is sitting by designation.

function as a civilian citizen. He concluded that he was giving no more support to war in his position than he did by paying taxes. After coming to Fort Sheridan, he "became increasingly aware that [he] too faced a real possibility of being sent to a war zone," and the conflicting opinions he had had about killing when he had first entered the service strengthened. By the summer of 1970 he knew he must make a decision. "[T]he feeling that I did not want to be involved in killing grew from a mere feeling to a strong belief that I must not and cannot be a part of the negative and destructive force that is war." He learned from an Army lawyer that there were no procedures whereby he could continue serving throughout his period of enlistment as a bandsman at Fort Sheridan, which he apparently was willing to do. His strengthened belief was limited apparently to precluding him from undertaking substantially similar duties in a zone in which war was being waged.

Following an interview with Okerlund, Chaplain Hager reported that Okerlund appeared sincere in his thinking and "has stated that his decision to make this application is based on his disapproval of war zone duty." An interviewing psychiatrist reported that there was no psychiatric difficulty militating against Okerlund receiving further consideration for the status of conscientious objector. His unit commander, a warrant officer who had only recently arrived at the fort, recommended approval of the application as did a chief warrant officer acting on behalf of the Commanding General of the Fifth Army. The application was then reviewed by the Office of the Adjutant General who disapproved the application upon the recommendation of the Conscientious Objector Review Board. That Board had concluded that Okerlund's views did not indicate opposition to war in any form and that his application, being predicated largely on his disapproval of war zone duty, demonstrated insufficient depth of conviction to justify awarding him a discharge as a conscientious objector.

Thereafter Okerlund filed a petition for a writ of habeas corpus in the district court, which held that the ultimate Army determination had no basis in fact and granted the relief from which this appeal is taken.

Prior to oral argument before this court, Okerlund filed a motion to dismiss the appeal on the ground of mootness. Consideration of the motion was deferred to be taken with the principal issues. The mootness claim stems from the fact that the Secretary of the Army, on April 22, 1971, ordered Okerlund's release effective April 26, 1971. Okerlund therefore argued that his release from custody rendered him no longer subject to Army jurisdiction. A stay of discharge was subsequently granted pending the present appeal.

The procedure governing release and discharge from the armed forces is set out in 10 U.S.C. § 1168, which provides: "A member of an armed force may not be discharged or released from active duty until his discharge certificate or certificate of release . . . [is] ready for delivery to him . . . ." No discharge or release certificate was delivered to Okerlund when his release was ordered. In addition, paragraph 5–12 of Army Regulation 635–200 draws a distinction between release and discharge. While discharge is a "complete severance from all military status," release leaves the person subject to recall to "complete unexpired enlistments and/or unfulfilled obligations." Because Okerlund was "released" and not "discharged," he is still under military jurisdiction. We are not disposed to cut off a litigant's access to the appellate process simply because the Army chose to release Okerlund from its custody during the pendency of an appeal.

A second threshold question is that of the standard of review to be applied. The district court considered the matter on a "basis in fact" test. However, on this appeal Okerlund contends

that such a test, although admittedly used in reviewing selective service cases, should not be applied to an in-service situation. We are urged to apply the widely-used "substantial evidence" test as found in Section 10 of the Administrative Procedure Act, 5 U.S.C. § 706. It is true that the "basis in fact" standard of review, although first making an appearance in case law, Estep v. United States, 327 U.S. 114, 122–123, 66 S.Ct. 423, 90 L.Ed. 567 (1946), is now incorporated in the Selective Service Act of 1967, 50 U.S.C. App. § 460(b)(3), which per se would not be applicable to an in-service case. However, the fact remains that the standard was judicially established and was reaffirmed in the conscientious objector context, United States v. Seeger, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). While it may be true, as Okerlund contends, that courts have applied the same standard in the in-service cases "by rote," we fail to discern any persuasive reasons for applying a different standard to the in-service situation, particularly in regard to conscientious objection which involves to a considerable extent freedom from service to country by virtue of what might be termed a discretionary act of grace. See Lovallo v. Resor, 443 F.2d 1262, 1265 n. 6 (2d Cir. 971). Just as the judicial standards for measuring claims of in-service objectors are the same as the statutory tests applicable in a pre-induction situation, Gillette v. United States, 401 U.S. 437, 442, 91 S. Ct. 828, 28 L.Ed.2d 168 (1971), the test to be applied to the action of the administrative bodies in the two situations should, in our opinion, be the same.

■ The Government contends that conscientious objection, viewed in the context of sincerity, cannot be made to depend upon the vagaries of duty assignment. We agree with this contention in principle, but we must determine whether the aphorism is dispositive of Okerlund's case. He contends that, because his sincerity was attested to by all of the officers who interviewed him and because even the Army's review board

did not find him to be insincere, there was neither basis in fact nor substantial evidence supporting the ultimate Army determination. While so arguing, he candidly admits in his brief that "[h]ad his impending assignment been to anywhere but to a war zone, he would not have applied for a discharge."

We assume, on an arguendo basis at least, that Okerlund sincerely disapproved of war zone duty for himself. However, in our opinion this begs the question. He was not opposed to being a part of the war establishment so long as that membership was geographically well removed from an area which was one of the principal causes for the existence of the military institution.

■ Although not entirely identical in factual situations, cases do provide guidelines. Within the limited "basis in fact" scope of review, a belated conscientious objector application following assignment to Vietnam is a proper element for consideration. Dix v. Resor, 449 F.2d 317, 318 (2d Cir. 1971). The anticipation of deployment as a bandsman to a less desirable duty station could be found to be not the kind of prospect that would legitimately bring to fruition a conscientious objection to participation in war. Lovallo v. Resor, 443 F.2d 1262, 1265 (2d Cir. 1971). Congress may properly decide that the objector to a particular war rather than to all wars does not have a claim distinct enough and intense enough to justify special status. Gillette v. United States, 401 U.S. 437, 460, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971). That special status is accorded to "those whose consciences, spurred by deeply held moral, ethical, or religious beliefs, would give them no rest or peace if they allowed themselves to become a part of an instrument of war." Welsh v. United States, 398 U.S. 333, 344, 90 S.Ct. 1792, 1798, 26 L.Ed.2d 308 (1970).

■ In our opinion, the Army Board could properly have found that Okerlund did not meet the last mentioned guidelines. It is true he did not purport to

express conscientious objection to the Vietnam war as such; however, he did single out the shooting phase of war as being repugnant to his conscience. His position seems to us to ignore completely that the service he had performed, apparently without nonconcurrence until he learned of the potential Vietnam assignment, was an integral component of the war machinery, or, in the words of Mr. Justice Black in *Welsh, supra*, the band itself could properly be termed "an instrument of war."

Music may well have charms to soothe the savage breast and military bands may well play Liebestraum at public concerts, but it seems fair to say that this is not the customary genre. Okerlund stressed in his application that a great many of the band's performances were for public relations of a non-military nature. His intended emphasis, no doubt, was on the phrase "non-military nature," but it seems unlikely that the cost of these concerts was budgeted for purposes of providing public entertainment. The emphasis, of which the reviewing board must have been aware, was on public relations. It can scarcely be contended that the public image of the military in recent years has been one of universal popularity. To secure better public relations by providing free band concerts is to secure more effective support for the institution whose purpose is war, whether offensive or defensive. Improved public relations could result in greater likelihood of voluntary participation. Ironically, those who might volunteer as a result of interest thus inspired might well be shipped to the area to which at least this participant in the inspirational process is not desirous of going.

Directly, of course, over and above the so-called non-military concerts, the marching type of music associated with military bands has often been of the call to colors category, designed to stimulate zeal for the cause and pride in the organization. Okerlund did not join a civic instrumental group; he joined the Army and served in a branch deemed necessary in the overall picture of that organization. He participated in the same basic training as other soldiers whether they eventually ended in a desk job or the trench infantry. Each in his own way was a part of the war effort. Okerlund would confine his on behalf of the war effort to a civilian sphere. In our opinion, the Review Board correctly recommended that his views did not place him in the category of those opposed to war in any form.

For the reasons hereinbefore set out, it is our opinion that the writ of habeas corpus was improperly granted and, of course, it would follow that the discharge should not have been ordered. Accordingly, the judgment of the district court is reversed.

Reversed.