# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 04-2446

RASHEED ALHASSAN,

*Petitioner-Appellant*,

*v.*

GENERAL MICHAEL W. HAGEE,
Commandant, United States Marine Corps,

and

MAJOR JON D. QUEHL,
United States Marine Corps,

*Respondents-Appellees*.

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 04 C 1076—**Michael M. Mihm**, *Judge*.

_____

ARGUED DECEMBER 3, 2004—DECIDED SEPTEMBER 1, 2005

_____

Before BAUER, EASTERBROOK, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*.    Lance Corporal Rasheed Alhassan sought a discharge from the United States Marine

Corps as a conscientious objector but his request for conscientious objector status was denied. Alhassan petitioned the district court for relief under habeas corpus but the district court denied his petition finding that the Marine Corps had a basis in fact for denying him status as a conscientious objector because he made his request immediately after learning of his imminent departure to Iraq and he never expressed any anti-war religious sentiment until he was about to be deployed. We agree with the district court's well reasoned opinion and affirm.

## I. BACKGROUND

Rasheed Alhassan ("Alhassan") enlisted in the United States Marine Corps Reserve ("Marine Corps") in July 2002 for a term of eight years. At the time of Alhassan's enlistment, he was twenty-one years old and declared that he was not a conscientious objector. When he enlisted, Alhassan also stated that he did not, nor did he ever have, "a firm, fixed, and sincere objection to participation in war in any form or to the bearing of arms because of religious belief or training." Unattached App. to Appellant's Br. at 82 (hereafter referred to as "Unattached App.").

In October 2002, Alhassan successfully completed boot camp at Camp Pendleton, California and attended seventeen days of follow-up training at the Marine Combat Training Battalion, which trains all non-infantry Marines in the skills essential to operate in a combat environment. After completing additional training for his military occupational specialty as a motor vehicle operator, the Marine Corps assigned Alhassan to Charlie Company 6th Engineering Support Battalion ("the Unit"), located in Peoria, Illinois.

When Alhassan reported to the Unit on January 19, 2003, Gunnery Sergeant J.K. Howard informed Alhassan that the Unit had been activated in support of Operation Iraqi

Freedom. According to Howard's notes, Alhassan responded to this news by stating that he probably would not be able to attend Bradley University in the fall, and by expressing concern that his mother would be going through divorce proceedings during his absence. Significantly, Alhassan did not mention any ethical or religious concerns that would prevent him from deploying to Iraq.

Six days later, the Marine Corps transferred Alhassan's unit to Camp Pendleton for training in preparation for overseas deployment. Alhassan then requested and applied for conscientious objector status. After filing that application, Alhassan was interviewed by various military officials, pursuant to the Marine Corps's policy governing conscientious objector applications.

In his interview with Captain D.A. Dansak, a Navy psychiatrist on February 9, 2003, Alhassan said that he "'found Jesus' and accepted Him." Alhassan also stated that he had attended a few Sunday services but had not chosen a particular religion to follow and had not been baptized in any church. Alhassan also mentioned that he had not discussed this recent religious "conversion" with his girlfriend. Captain Dansek concluded that Alhassan was suffering from "routine military stress, mobilizing," but otherwise concluded that Alhassan was fit for deployment.

After Captain Dansek completed his report, Commander Ron Howard, a Navy chaplain, interviewed Alhassan and reported that although he determined Alhassan's belief that killing is wrong was sincere, he found Alhassan's "faith . . . very immature at this point and not well developed."

On March 3, 2003, Major Randy L. Anderson conducted a hearing to consider Alhassan's request for discharge as a conscientious objector. During the hearing, Alhassan was given an opportunity to express or present any evidence in support of his application for conscientious objector status. Alhassan answered Major Anderson's questions and

submitted a sworn statement. On March 10, 2003, Major Anderson concluded in a written report that while Alhassan appeared to be sincere in his beliefs, he did not consider him within the definition of a conscientious objector as provided for in Marine Corps Order 1306.16E, the guidelines which govern classification of conscientious objectors.[1] In reaching this conclusion, Major Anderson reasoned that Alhassan's conscientious objection did not manifest itself until Alhassan's unit was activated and about to deploy overseas to Iraq. In addition, when informed that his Unit had been activated, Alhassan did not mention any conscientious objection to war but instead focused on his enrollment in college and the well-being of his mother.

On April 15, 2003, Major Anderson's report, along with Alhassan's rebuttal, was forwarded to Lieutenant Colonel J.D. Lloyd, Commanding Officer, Headquarters Battalion. After reviewing the report and rebuttal, Colonel Lloyd recommended that Alhassan's request for conscientious objector status be denied. Colonel Lloyd agreed with Major Anderson's findings except he found that "[Petitioner] did not satisfy his burden of 'demonstrating a sincere opposition to war in any form based upon his religious beliefs and convictions.'" Unattached App. at 14.

On April 24, 2003, in accordance with Marine regulations, the entire record was reviewed by R.L. Price, a Marine

---

[1] Marine Corps Order 1306.16E provides:

Consistent with the policy contained in the references and this Order, an application for classification as a conscientious objector may be approved for any individual:

(1) Who is conscientiously opposed to participation in war in any form;

(2) where opposition is founded on religious training and belief; and

(3) whose position is sincere and deeply held.

Officer and attorney in the Staff Judge Advocate's Office of Commander Marine Forces Reserve. Mr. Price found the record "complete and legally sufficient." L.S. Taylor, Acting Commander, Marine Forces Reserve, forwarded Alhassan's record to the Commandant of the Marine Corps, General Michael W. Hagee. Alhassan submitted a rebuttal, and after reviewing both documents, General Hagee denied Alhassan's request for conscientious objector status.

Alhassan petitioned the district court for habeas corpus relief but the court rejected his petition, finding that the Marine Corps had a basis in fact for denying Alhassan's conscientious objector status. Alhassan timely appeals.

## II.  ANALYSIS

### A.  Standard of Review

A petition seeking habeas corpus relief is appropriate under 28 U.S.C. § 2241 when a defendant is challenging the fact or duration of his confinement. *Preiser v. Rodriguez*, 411 U.S. 475, 490 (1973); *Waletzki v. Keohane*, 13 F.3d 1079, 1080 (7th Cir. 1994). Section 2241 requires that the petitioner be in "custody". 28 U.S.C. § 2241(c)(3) (2005). However, this term does not necessarily mean physical detention in jail, but can also mean a restraint of liberty. *Peyton v. Rowe*, 391 U.S. 54, 66 (1968). Servicemen are sufficiently in "custody" to invoke the provisions of Section 2241 and may do so after exhausting all avenues of administrative relief. *Parisi v. Davidson*, 405 U.S. 34, 35 (1972); *Schlanger v. Seamans*, 401 U.S. 487, 489 (1971); *Oestereich v. Selective Serv. Sys. Local Bd.*, 393 U.S. 233, 235 n.5 (1968).

In order to prevail, the government has the burden of proving that there was a "basis in fact" for its denial of Alhassan's application. *Estep v. United States*, 327 U.S. 114, 122 (1946); *United States ex rel. Okerlund v. Laird*, 473

F.2d 1286, 1288-89 (7th Cir. 1973). Our review of a decision supported by a basis in fact standard of review is limited, and has been described by the ninth circuit as "the narrowest review known to the law." *Woods v. Sheehan*, 987 F.2d 1454, 1456 (9th Cir. 1993) (quoting *Koh v. Sec'y of the Air Force*, 719 F.2d 1384, 1385 (9th Cir. 1983)); *see also Okerlund*, 473 F.2d at 1289. The reviewing court does not weigh the evidence for itself or ask whether there is substantial evidence to support the military officials' denial of the applicant's request for conscientious objector status. *Witmer v. United States*, 348 U.S. 375, 380-81 (1955). Rather, the court "search[es] the record for some affirmative evidence" to support the government's overt or implicit finding that the applicant "has not painted a complete or accurate picture of his activities." *Dickinson v. United States*, 346 U.S. 389, 396 (1953). In other words, the reviewing court should look for some proof that is incompatible with the applicant's claims. *Id.*

## B. "Basis in Fact" Analysis

A conscientious objector has no constitutional or statutory right to be discharged from active service after voluntary enlistment. *Roby v. United States Dep't of the Navy*, 76 F.3d 1052, 1055 (9th Cir. 1996); *Sanger v. Seamans*, 507 F.2d 814, 817 (9th Cir. 1974); *DeWalt v. Commanding Officer*, 476 F.2d 440, 442 (5th Cir. 1973). Service members' rights to request conscientious objector status derive from military regulations. *See Parisi v. Davidson*, 405 U.S. 34, 38 n.2 (1972). The Department of Defense ("DOD") has implemented procedures for service members to apply for conscientious objector status. 32 C.F.R. § 75. As such, the Marine Corps has promulgated a regulation that executes the DOD procedures. Marine Corps Order 1306.16E, *supra* note 1. As described earlier, under Marine Corps Order 1306.16E, Alhassan must show first that he is conscientiously opposed

to participation in war in any form. Second, that this opposition is based on religious training and beliefs, and third, that his position is sincere and deeply held. *Id.*

Alhassan argues here that the Marine Corps's denial of his application had no basis in fact. The Marine Corps does not challenge Alhassan's assertion that he is conscientiously opposed to war in any form. However, relying on the reports of Major Anderson, Lieutenant Colonel Lloyd, and the final decision of General Hagee, it challenges Alhassan's ability to satisfy the second and third prongs of Marine Corps Order 1306.16E.

We find that there was some basis in fact for the decision of the Marine Corps to deny Alhassan's application. Because the "ultimate question in conscientious objector cases is the sincerity of the registrant," *Witmer*, 348 U.S. at 381, we review the record for "some inference of insincerity or bad faith." *Id.* at 382. Within the "basis in fact" standard of review, we have found that "a belated conscientious objector application following assignment is a proper element for consideration." *Okerlund*, 473 F.2d at 1289.

On July 22, 2002, Alhassan enlisted for eight years in the Marine Corps Reserve. On January 23, 2003, less than a year later, Alhassan applied for conscientious objector status after receiving orders which would have placed his unit directly in support of Operation Iraqi Freedom. Although the timing of Alhassan's application is not by itself a basis for insincerity, we can factor the timing of an application for conscientious objection status into our analysis. *Id.* In July 2002 when Alhassan enlisted he stated that he did not, nor did he ever have, "a firm, fixed, and sincere objection to participation in war in any form or to the bearing of arms because of religious belief or training." Six months later, upon learning of his imminent deployment to Iraq, Alhassan informed his superiors for the first time that he harbored convictions against war and filed his

application for discharge as a conscientious objector. As the district court noted, despite Alhassan's claim to have developed his beliefs during boot camp, there is no indication that he told his parents, girlfriend, or any of his superiors at boot camp about his concerns. Alhassan did not raise this issue during his post-boot camp combat training or during his motor vehicle training. In addition, Alhassan did not disclose his objections to war when Gunnery Sergeant Howard informed him that the Unit was being deployed to Iraq. Alhassan only expressed concerns about how his mother would handle her divorce in his absence, and his inability to return to college in the fall. Alhassan even remained silent when accompanying the Unit to Camp Pendleton to prepare for deployment. It was not until Alhassan had been at Camp Pendleton for approximately two weeks, and the possibility of deployment to Iraq became even more imminent, that he informed anyone in his chain of command that he had a conscientious objection.

As the reviewing court in this matter, it is not our job to assess whether the military had *substantial* evidence to support its conclusion that Alhassan's opposition was not based on religious training and beliefs, and that his position was not sincere and deeply held. We need only determine whether all of the facts suggest that there is "some proof that is incompatible with the applicant's claim." *Roby*, 76 F.3d at 1055. Here, we conclude that the Marine Corps had a basis in fact for its decision denying Alhassan's application.

Alhassan argues that we should rely on *United States v. Lemmens*, 430 F.2d 619 (7th Cir. 1970) and *United States v. Joyce*, 437 F.2d 740 (7th Cir. 1971), which he reads to suggest that the timing of a conscientious objector's application is of little importance. In *Lemmens*, we concluded that the timing of the plaintiff's conscientious objection application did not suffice as a basis in fact. 430 F.2d at 624.

Similarly, in *Joyce*, we held that, "[t]ardiness standing alone, however, carries slight weight in light of the subjectivity of the beliefs involved and the fact that aging, as well as external circumstances, may serve to crystallize sincere beliefs in a young man's mind long after his initial registration." 437 F.2d at 745. However, both *Joyce* and *Lemmens* are not applicable in this case.

Both *Joyce* and *Lemmens* were cases we decided during the Vietnam era and involved *draftees* to the military. These draftees developed their conscientious objection after complying with their mandatory application to the draft board. *Joyce*, 437 F.2d at 744; *Lemmens*, 430 F.2d at 622. Our decision in *Okerlund*, 473 F.2d at 1289, is closer to the facts surrounding Alhassan's application for conscientious objection. *Okerlund*, as with the case at bar, both involve soldiers *who voluntarily enlisted into the military*, and then began the conscientious objector process after realizing that the military was to send them to a combat zone. *Id.* Alhassan argues that there is no difference between cases in which a soldier volunteers in the military versus cases in which a soldier is drafted. We disagree. Alhassan volunteered, of his own free will, to serve in the Marine Corps. Before enlisting, he signed a document stating that he had no "firm, fixed, and sincere objection to participation in war in any form or to the bearing of arms because of religious belief or training." In *Joyce* and *Lemmens*, the men had no choice as to whether they would volunteer or not—they were drafted and both men began their conscientious objection applications at various stages of the draft process.

Because Commander Howard found Alhassan's "faith . . . very immature at this point and not well developed," presumptively relying on Marine Corps Order 1306.16E, which provides that an application for conscientious objection may be approved for an individual "whose position

is sincere and deeply held,"[2] Alhassan also argues that we should adopt the reasoning of the Fifth Circuit in *Helwick v. Laird*, 438 F.2d 959 (5th Cir. 1971). *Helwick*, another Vietnam era draft case in which Helwick's chaplain and unit commander recommended that Helwick's conscientious objector application be rejected because of the lack of "depth and maturity" of Helwick's views, held that "depth and maturity" factors were an insufficient basis for denying Helwick's application, and that the government can only measure the sincerity of a conscientious objector's religious convictions and not the depth or stage of an applicant's religious development. *Id.* at 964. The First and the Eighth circuits also rejected the "depth of conviction" as an independent element of the government's conscientious objector test. *See Hager v. Sec'y of the Air Force*, 938 F.2d 1449 (1st Cir. 1991); *Kemp v. Bradley*, 457 F.2d 627 (8th Cir. 1972)[3]. However, we decline to follow this reasoning. The holding of *Helwick* is not the law of this circuit. In *Joyce*, we

---

[2]  Alhassan has alleged no constitutional violation here, he simply argues that the Marine Corps should not be able to assess the depth of his conviction.

[3]  In *Kemp*, 457 F.2d at 629, the court wrote:

"'Depth of conviction' requires theological or philosophical evaluation. We think it unwise to adopt this more complex concept as the requirement which a Selective Service registrant or member of the Armed Forces must fulfill in order to qualify for conscientious objector classification."

In *Hager*, 938 F.2d at 1459, the First Circuit adopted the Eighth Circuit's reasoning, adding that when:

"the military undertakes to measure the depth with which the applicant holds [his] belief, we think the inquiry becomes an impermissible subjective look into [the] heart and soul. The question is, *does* he believe, not, *how deeply* does he believe. *Id.* (emphasis in original).

specifically held that, "*United States v. Seeger*, 380 U.S. 163 makes it abundantly clear that the [government] must focus on the nature and depth of the registrant's individual beliefs, however derived or inspired, whether orthodox or unorthodox." 437 F.2d at 744. We decline to disturb this holding.

The courts have a history of giving the military a wide scope of deference in crafting its own regulations. *Meinhold v. Dep't of Def.*, 34 F.3d 1469, 1476-77 (9th Cir. 1994) (". . . we are guided by [a] long-settled rule: The military's 'considered professional judgment,' is 'not lightly to be overruled by the judiciary.' . . . Our review, therefore, is as deferential as our constitutional responsibilities permit."); *Turpin v. Resor*, 452 F.2d 240, 242 (9th Cir. 1971); *Steffan v. Perry*, 41 F.3d 677, 684-85 (D.C. Cir. 1994) ("It is hard to imagine a more deferential standard than rational basis, but when judging the rationality of a regulation in the military context, we owe even more special deference . . ."). The reason for the courts' deference to the military, in particular to manage its own regulations, is simple, judges are not military leaders and do not have the expertise nor the mandate to govern the armed forces.

### III. CONCLUSION

It is not our function, as the reviewing court, to determine whether the Marine Corps had substantial evidence to determine that Alhassan's opposition to war was not adequately based on religious training and beliefs, or that his position was not sincerely and deeply held. The relationship between a person, his or her deity, and his or her religion is a highly personal matter, and one in which it can take as long as a lifetime, or even as short as a few days, to develop a sincere and deep understanding of religious teachings, dogma, and the deity that one believes in itself. Our duty is only to determine whether there is a basis in fact for the Marine Corps's decision to deny Alhassan's

application as a conscientious objector. The simple fact is that the timing of this application, combined with the enlistment contract that Alhassan signed stating that he did not have a conscientious objection to war, along with the fact that Alhassan did not mention his beliefs to anyone in his chain of command nor his close friends until his imminent departure to Iraq, lead us to believe that the government has indeed provided affirmative evidence supporting its decision to deny Alhassan's application as a conscientious objector, and as such has created a basis in fact for its decision. Therefore we AFFIRM the decision of the district court.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*