# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 21, 2006　　　Decided February 16, 2007

No. 06-5241

AGUSTÍN AGUAYO,
APPELLANT

v.

FRANCIS J. HARVEY, SECRETARY OF THE ARMY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 05cv01580)

*Peter Goldberger* argued the cause for appellant. With him on the briefs was *James R. Klimaski*.

*Kevin K. Robitaille*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: GINSBURG, *Chief Judge*, and SENTELLE and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: Agustín Aguayo, a soldier in the United States Army, applied for a discharge as a conscientious objector. The Army denied his application, and Aguayo filed a petition for a writ of habeas corpus in the district court. The court denied the petition, and Aguayo now appeals. Because there is evidence in the record that supports the Army's decision to deny Aguayo's application for conscientious objector status, we affirm.

**I**

Aguayo volunteered to serve in the United States Army in November 2002, when he was 30 years old. In his enlistment agreement, Aguayo answered "no" to the following question:

> Are you now or have you ever been a conscientious objector? (That is, do you have, or have you ever had, a firm, fixed, and sincere objection to participation in war in any form or to the bearing of arms because of religious belief or training?)

Aguayo committed to eight years in the Army, with four years of active duty, and entered service as a healthcare specialist in January 2003.

In February 2004, shortly before he was deployed to Iraq, Aguayo applied for a discharge from the Army on the basis of conscientious objection. It is the policy of the U.S. military to grant conscientious objector ("CO") status to any service member:

> (1) Who is conscientiously opposed to participation in war in any form;
> (2) Whose opposition is founded on religious training and beliefs; and

(3) Whose position is sincere and deeply held.

32 C.F.R. § 75.5(a). An applicant who would have qualified for CO status before entering the military, however, generally is not eligible for CO classification once in the service. *Id.* § 75.4(a). The Army has implemented this military-wide policy in Army Regulation ("AR") 600–43.[1] A "Class 1-O" conscientious objector is entitled to separation from the Army, while a "Class 1-A-O" objector will continue in military service in a noncombatant status. *See* 32 C.F.R. § 75.3(a). Aguayo applied only for Class 1-O status.

Aguayo explained in his application that "[m]y moral view does not allow me to take the life of another human being," and that his "progressive training in arms and other military operations have progressively, and from the very beginning, caused me great anguish and guilt." Pursuant to Army regulations, Aguayo was evaluated by a psychologist and interviewed by a chaplain. The chaplain reported that "PFC [Private First Class] Aguayo seems to be sincere in his beliefs although the timing of his request makes it questionable. It is difficult to assess the depths of his beliefs because they rest solely with in his own thinking and personal values with out the support of background, family or faith group."

Captain Sean Foster was assigned to investigate the application, and in March 2004 he held a hearing in Tikrit, Iraq. Aguayo and four witnesses testified. Captain Foster wrote that after reviewing the evidence and hearing testimony, "it seemed clear to me that PFC Aguayo is absolutely sincere in his stated

---

[1] In this opinion we cite to the May 15, 1998 version of AR 600–43 in effect at the time of Aguayo's application. Some provisions were renumbered in the August 21, 2006 revision but the regulation is substantively unchanged.

beliefs that he is opposed to 'war in any form,'" and that Aguayo's opposition to war grew during basic training and solidified during live fire exercises. Captain Foster concluded that "PFC Aguayo's stated beliefs that he is internally incapable of participating in any form of war without being in a constant state of personal moral dilemma is absolutely sincere," and recommended that the application be granted.

The application was then forwarded through Aguayo's chain of command. Aguayo's Company Commander recommended approval, and noted that "Soldier appears to have a legitimate concern with being a soldier and this conflicts negatively with his ability to perform his duties." The next four officers to review the application, however, recommended disapproval. Aguayo's Battalion Commander interviewed Aguayo and wrote that Aguayo's "pursuit of conscientious objector status is an attempt to remedy his anxiety all soldiers face during an extended deployment in a combat theater of operations." Aguayo's Brigade Commander concurred in the Battalion Commander's assessment and wrote that he "d[id] not believe that soldier's belief is consistent w/ conscientious objection." The Staff Judge Advocate responsible for reviewing Aguayo's application also recommended disapproval. He wrote:

> PFC Aguayo's convictions do not appear to be sincerely held. . . . He has not persuasively shown how his duties as a medic are incompatible with his newly discovered beliefs, other than stating he feels he was misled by his recruiter, and he expected to work in a hospital. The timing of his application raises doubts as well. . . . PFC Aguayo did not identify any specific ways he has altered his behavior to accommodate his beliefs. Although practicing a religion is not a requirement for CO approval, PFC Aguayo has not discussed any equally significant source of his beliefs other than he was raised

in a kind and respectful family. . . . As stated by his battalion commander, . . . he desires to get out of the deployment and the Army, and he is using this process in an attempt to end his service early.

Finally, Aguayo's Division Commander recommended disapproval. Aguayo's application then went to the Department of the Army Conscientious Objector Review Board ("DACORB" or "Board") at the Department of the Army headquarters ("HQDA"); the DACORB makes the final decision on all CO applications requesting discharge. The Board denied Aguayo's application in July 2004.

In August 2005 Aguayo petitioned the United States District Court for the District of Columbia, pursuant to 28 U.S.C. § 2241, for a writ of habeas corpus ordering the Army to discharge him as a conscientious objector. The parties agreed to stay the proceedings in light of Aguayo's assertion that the Army had violated its own regulations by failing to provide him with the opportunity to rebut the negative recommendations from the officers in his chain of command. Aguayo then submitted an amended application, and the Army agreed to have the DACORB review the entire application de novo.

The amended application included a rebuttal to the officers' recommendations and more detailed responses to several questions from Aguayo's initial application. For example, Aguayo explained that his beliefs had changed during his Army training:

> As the trainings progressed I knew I could not stab anyone with a bayonet for instance. And when I felt the earth tremble beneath me after firing an M-16 I felt and I now know there's no way I could point it at someone and shoot. . . . My convictions are strong and are deeply

rooted based on my upbringing, morals, and the experiences I have had in the army.

As to the nature of his beliefs, Aguayo explained that he was agnostic and that he had "a deep admiration for people such as Jesus Christ, Gandhi, and Martin Luther King. I treasure their values and desire to follow their lead. . . . I believe that if there is a creator he would not want his creations to hurt or damage each other." To the question of what aspects of his life "most conspicuously demonstrate[] the consistency and depth" of his beliefs, Aguayo wrote that "I avoid violent movies and violent entertainment. I try to avoid the more warlike aspects of training. I will always try to act in accordance with my beliefs."

In January 2006 the DACORB again denied Aguayo's application. The denial stated that "[a]fter thorough examination of the Case Record, the DACORB determined that the applicant did not present clear and convincing evidence, IAW [in accordance with] AR 600–43, that the applicant's stated beliefs warrant award of 1-O status."

On March 14, 2006, Aguayo filed an amended habeas corpus petition in the district court. In April, the Army opposed the amended petition and filed the administrative record as well as a memorandum from the DACORB dated March 24, 2006 (the "supplemental memorandum"). This memorandum lists several reasons why the DACORB denied Aguayo's application:

> • Applicant lacks the religious foundation; the underpinning that supports Conscientious Objector beliefs.
> • Applicant has not provided any significant source of his beliefs; conscience or moral views that would warrant Conscientious Objector status.

- Appears that applicant held beliefs prior to entry to the Army. Although these could have crystallized after entry, it still appears that these beliefs were considerable prior to entry with no significant identification of these beliefs at entry to the Army.
- Questionable timing of the application just prior to unit deployment.

The supplemental memorandum also states that "[t]his is not an exhaustive or all-inclusive list of reasons for the denial of this application."

In August 2006 Aguayo sought an injunction to prevent his deployment to a war zone pending the resolution of his habeas claim. By order and opinion of August 24, 2006, the district court denied Aguayo's habeas petition and denied the injunction as moot. *Aguayo v. Harvey*, 445 F. Supp. 2d 29 (D.D.C. 2006). Aguayo immediately appealed and sought an injunction from this court. We denied the injunction pending the appeal but agreed to expedite the case. Aguayo argues that we should reverse because the district court should not have considered the DACORB's supplemental memorandum and because there is no basis in fact for the denial of his CO application. We disagree with these arguments and affirm.[2]

---

[2]We have been advised that, after this court denied the injunction, Aguayo failed to report for his unit's movement to Iraq and departed without the authority of his unit. At the time of oral argument, Aguayo was in Army custody and faced court-martial charges. As discussed below, we base our decision on the record before the district court. Because we affirm the judgment of the district court, Aguayo's current status does not affect our disposition of this case. *See Parisi v. Davidson*, 405 U.S. 34, 46 n.15 (1972).

**II**

For purposes of the federal habeas corpus statutes, members of the Armed Forces are in the custody of the United States government. *Parisi*, 405 U.S. at 39. After exhausting all procedures for administrative relief, service members may challenge their custody by petitioning for a writ of habeas corpus in federal court under 28 U.S.C. § 2241. *Parisi*, 405 U.S. at 39; *Alhassan v. Hagee*, 424 F.3d 518, 521-22 (7th Cir. 2005).

**A**

Aguayo's first argument concerns the DACORB's March 2006 supplemental memorandum, which lists several reasons for the Board's denial of Aguayo's application. Aguayo contends that the district court should not have consulted this memorandum – and accordingly that the memorandum should be disregarded on appellate review – because it was created after Aguayo filed his amended habeas petition and because the memorandum does not comply with military regulations. We hold that the supplemental memorandum may properly be reviewed in assessing the merits of Aguayo's habeas petition.

Aguayo is correct that judicial review of an administrative decision is generally limited to the existing administrative record. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). But this principle of administrative law does not preclude consideration of the supplemental memorandum in this habeas corpus proceeding. Under the Administrative Procedure Act ("APA"), agencies generally must state the grounds for their decision to deny a written application. *See* 5 U.S.C. § 555(e); *Tourus Records, Inc.*

*v. Drug Enforcement Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001); *Roelofs v. Sec'y of the Air Force*, 628 F.2d 594, 599 (D.C. Cir. 1980). This requirement facilitates judicial review, because one of the tasks of the reviewing court is to determine whether an agency decision finds adequate support in the administrative record. Accordingly, when the statement of reasons is inadequate, in an APA case "the usual remedy is a 'remand to the agency for additional investigation or explanation.'" *Tourus Records*, 259 F.3d at 737 (quoting *Florida Power & Light*, 470 U.S. at 744). In this case, the supplemental memorandum provides additional explanation, and we are not inclined to disregard it simply because it was not produced in response to a remand.

Moreover, in refusing to ignore the supplemental memorandum we note that we are not reviewing a claim brought under the APA but rather a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. Habeas proceedings are governed by their own rules, and Habeas Corpus Rule 7 expressly provides that "the judge may direct the parties to expand the record by submitting additional materials relating to the petition." Rules Governing § 2254 Proceedings, Rule 7(a), 28 U.S.C. foll. § 2254. *See also id.* Rule 7(b) ("The materials that may be required include letters predating the filing of the petition, documents, exhibits, and answers under oath to written interrogatories propounded by the judge. Affidavits may also be submitted and considered as part of the record."); *id.* Rule 1(b) ("district court may apply any or all of these rules to a habeas corpus petition not covered" by scope of Rules Governing § 2254 Proceedings). In this case, the judge did not direct the Army to expand the record but instead accepted the memorandum as an attachment to the Army's opposition papers; this is a distinction without a difference and we will not exclude the memorandum on this basis. Aguayo also argues that, Habeas Rule 7 notwithstanding, courts may not consider new

evidence in reviewing a conscientious objector habeas petition. *See, e.g.*, *Armstrong v. Laird*, 456 F.2d 521, 522 (1st Cir. 1972). But this argument has no bearing on this case. We agree that the Army's decision to reject Aguayo's CO application must be supported by evidence in the administrative record as that record existed when it was reviewed by the DACORB, but the supplemental memorandum does not purport to contain such evidence. Rather, it lists reasons for the Board's decision, and under the standard of review we apply to a denial of a service member's CO application, it is the Board's decision that must have a factual basis. (The standard of review we apply to the Army's denial of Aguayo's CO application is discussed below in section II.B.) The supplemental memorandum might tell us where to look for evidence that Aguayo is or is not entitled to be classified as a conscientious objector, but we emphasize that in reviewing the Board's decision we look to the same evidence reviewed by the Board.

Aguayo also contends that the supplemental memorandum cannot be considered because it did not comply with the military's conscientious objector regulations. "The reasons for an adverse decision will be made a part of the record and will be provided to the individual." 32 C.F.R. § 75.6(f). The corresponding Army regulation provides that "[i]f a determination by HQDA that the person's request is disapproved [*sic*], the reasons for this decision will be made a part of the record. It will be provided to the person through command channels." AR 600–43 ¶ 2-8.*d*.(3). Aguayo argues that the supplemental memorandum was not "made a part of the record," because it was created after Aguayo filed his amended petition; Aguayo also states that he did not receive the memorandum "through command channels." The Army responds that the memorandum was indeed provided to Aguayo's commanding officer, and in any event Aguayo learned about the supplemental memorandum when the Army filed it with the district court. We

agree with the Army that any errors in the Army's handling of the memorandum do not merit excluding it from consideration.

Because we will not exclude the supplemental memorandum from consideration, we do not reach Aguayo's argument that the remainder of the record does not present a valid reason for denying his application.  As Aguayo rightly points out, the DACORB's January 2006 decision does not give us much to work with.  It states simply that "[a]fter thorough examination of the Case Record, the DACORB determined that the applicant did not present clear and convincing evidence, IAW [in accordance with] AR 600–43, that the applicant's stated beliefs warrant award of 1-O status."  But because we hold that the supplemental memorandum is properly before this court, we need not decide whether this boilerplate denial would be sufficient to guide judicial review of the DACORB's decision in light of the regulations' clear requirement that the Board provide its reasons for denying an application.  *Cf. Gruca v. Sec'y of the Army*, 436 F.2d 239, 245 (D.C. Cir. 1970) (holding, in a case involving a challenge to a Selective Service classification, "[i]t is enough if there is evidence in the record from which we can garner the basis of the Board's action").  Nor do we decide what the appropriate remedy would be if it were not sufficient.  *See, e.g.*, *United States ex rel. Coates v. Laird*, 494 F.2d 709, 712 (4th Cir. 1974) (holding that, where the Marine Corps failed to give a reason for its denial of a CO application, the proper procedure "is to remand the proceedings to the service for reprocessing and for compliance with the requirement of a statement of reasons").

**B**

The Army's decision to deny an application for conscientious objector status will not be disturbed unless there is no factual basis for the decision.  *United States v. Seeger*, 380

U.S. 163, 185 (1965); *United States ex rel. Barr v. Resor*, 443 F.2d 707, 708 n.2 (D.C. Cir. 1971). The scope of our review under the "basis in fact" standard is extremely narrow. We neither substitute our judgment for that of the military nor look for substantial evidence to support its decision. *Witmer v. United States*, 348 U.S. 375, 380-81 (1955). Under this standard the Army's decision "can be overturned only if it has 'no basis in fact.'" *Id.* at 381; *see also Dickinson v. United States*, 346 U.S. 389, 396 (1953).

"Basis in fact" review in conscientious objector cases traces to the Supreme Court's 1946 decision in *Estep v. United States*, 327 U.S. 114. Under the conscription laws then in effect, decisions of civilian draft boards regarding the classification of selective service registrants were "final" and the law did not provide for judicial review. Estep was prosecuted for failing to submit to induction, and the Court held that he could challenge his military service classification in that prosecution.

> The provision making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant.

*Estep*, 327 U.S. at 122-23; *see also Dickinson*, 346 U.S. at 394; *Witmer*, 348 U.S. at 380-81. In 1967 Congress amended the draft laws to reflect the limited judicial review recognized in

*Estep*, and the Selective Service Act now authorizes review of draft classifications in certain criminal prosecutions "only when there is no basis in fact for the classification assigned to such registrant."  50 U.S.C. App. § 460(b)(3); *see United States ex rel. Sheldon v. O'Malley*, 420 F.2d 1344, 1348 (D.C. Cir. 1969).

This same standard governs judicial review of a petition for a writ of habeas corpus following the military's denial of a service member's application for discharge as a conscientious objector.  In contrast to selective service registrants who request CO classification under the draft laws, however, those who have volunteered to serve in the military do not have a statutory right to apply for CO status.  Rather, the Department of Defense has, by regulation, authorized members of the Armed Forces to apply for such status.  Dep't of Defense Directive 1300.6 (Aug. 20, 1971 rev.), as codified in 32 C.F.R. pt. 75 (2004 ed.); *see Parisi*, 405 U.S. at 45.  This regulation "reflects a policy determination to extend to persons already within the armed services the rights of conscientious objection conferred by Congress upon those subject to the Selective Service Act."  *Sheldon*, 420 F.2d at 1348.  Accordingly, "judicial precedents involving claims to exemption from entry into military service because of conscientious objection are applicable to requests for discharge on the same ground by those who voluntarily entered the service."  *Id.*  Although the standard of review we apply in this case is dictated by precedent, we note that the limited scope of review in military habeas cases is consistent with the general principle that courts will afford military personnel decisions considerable deference.  *See Piersall v. Winter*, 435 F.3d 319, 321-22 (D.C. Cir. 2006).

**C**

On review of the administrative record, we agree with the Army that there is a factual basis for the decision to deny

14

Aguayo's CO application. Our review is guided by the Army's CO regulations and by the explanation for the Army's decision in the supplemental memorandum. By regulation, it is the applicant's burden to establish, by clear and convincing evidence, that he or she meets the requirements for conscientious objector status. AR 600–43 ¶ 1-7.*c*. The Army defines conscientious objection as "[a] firm, fixed and sincere objection to participation in war in any form or the bearing of arms, because of religious training and belief." *Id.* Glossary. "Religious training and belief" is broadly defined to include "deeply held moral or ethical belief, to which all else is subordinate or upon which all else is ultimately dependent, and which has the power or force to affect moral well-being." *Id.* The Supreme Court has stated that "the ultimate question in conscientious objector cases is the sincerity of the registrant." *Witmer*, 348 U.S. at 381. This concern for the applicant's sincerity is reflected in the Army's regulations:

> Sincerity is determined by an impartial evaluation of each person's thinking and living in totality, past and present. The conduct of persons, in particular their outward manifestation of the beliefs asserted, will be carefully examined and given substantial weight in evaluating their application.

AR 600–43 ¶ 1-7.*a*.(5)(*a*).[3] The regulations further provide a list

---

[3]The Department of Defense regulation includes a similar instruction:

> A primary factor to be considered is the sincerity with which the belief is held. Great care must be exercised in seeking to determine whether asserted beliefs are honestly and genuinely held. Sincerity is determined by an impartial evaluation of the applicant's thinking and living in its totality, past and present.

of factors to be considered in such an "impartial evaluation." These factors

> include training in the home and church; general demeanor and pattern of conduct; participation in religious activities; whether ethical or moral convictions were gained through training, study, contemplation, or other activity comparable in rigor and dedication to the processes by which traditional religious convictions are formulated; credibility of persons supporting the claim.

*Id.* ¶ 1-7.*a*.(5)(*b*). In addition to the applicant's own testimony and written application, the regulations call for a number of assessments and recommendations by Army personnel. A military chaplain interviews each applicant and provides comments on the applicant's demeanor, depth of conviction, and source of beliefs. *Id.* ¶ 2-3.*a*. An investigating officer, chosen from outside the applicant's chain of command, conducts a hearing and submits a report. *Id.* ¶¶ 2-4, 2-5. Officers in the applicant's chain of command and a Staff Judge Advocate review the record and offer their recommendations. *Id.* ¶ 2-6. The review process thus relies heavily on the considered opinions of a number of officers in addition to those who serve on the DACORB.

---

> Care must be exercised in determining the integrity of belief and the consistency of application. Information presented by the claimant should be sufficient to convince that the claimant's personal history reveals views and actions strong enough to demonstrate that expediency or avoidance of military service is not the basis of his claim.

32 C.F.R. § 75.5(c)(2).

In this case, the DACORB ruled that Aguayo "did not present clear and convincing evidence . . . that the applicant's stated beliefs warrant award of 1-O status." The March 2006 supplemental memorandum explained the Board's view that Aguayo lacked the "religious foundation" or "underpinning" required of conscientious objectors and had not adequately explained the source of his claimed beliefs; that Aguayo appeared to hold his beliefs prior to enlistment; and that the timing of Aguayo's application was suspect.

In short, the DACORB questioned the nature and source of Aguayo's beliefs. Accordingly, we review the record for evidence that would support the Board's misgivings, and we conclude that the Board's decision has factual support in the record. To be sure, Aguayo explained that "[m]y moral view does not allow me to take the life of another human being" as well as his belief that "higher forces will be in charge of any retribution against any evils." But the Army is entitled to require more than mere assertions of belief, and its regulations accordingly emphasize the applicant's "outward manifestation of the beliefs asserted" as well as the judgments of those who review each application. AR 600–43 ¶ 1-7.*a*.(5)(*a*). The nature of the applicant's case determines the type of evidence needed to rebut the claim. *Witmer*, 348 U.S. at 382. For example, *Dickinson* involved a Selective Service registrant who produced "uncontroverted evidence" that he met the objective statutory criteria for a ministerial exemption from military service. 346 U.S. at 396-97. The Supreme Court held that the local draft board's denial of the exemption must be supported by "some proof that is incompatible with the registrant's proof of exemption." *Id.* at 396. In *Witmer*, a conscientious objector case, the Supreme Court distinguished *Dickinson* and stated that "[i]f . . . the issue is the registrant's sincerity and good faith belief, then there must be some inference of insincerity or bad faith." 348 U.S. at 382. In the instant case, the issue is

Aguayo's demonstration of his beliefs as required by the Army's regulations and as assessed by the officers who reviewed his application. "Aside from an outright admission of deception – to expect which is pure naivety – there could be no more competent evidence against [a registrant's] claimed classification than the inference drawn from his own testimony and conduct." *Gruca*, 436 F.2d at 246 (quoting *Witmer*, 348 U.S. at 383). Here, the record supports the inference that Aguayo's convictions do not require his classification as a conscientious objector.

The Battalion Commander, Brigade Commander, Division Commander, and Staff Judge Advocate each recommended that Aguayo's application be denied. The Battalion Commander, who interviewed Aguayo, concluded that "[i]n [Aguayo's] mind, the psychological impact of being deployed in a combat theater and separated from his family, outweigh the benefits associated with military service." The Staff Judge Advocate concluded that "Aguayo did not identify any specific ways he has altered his behavior to accommodate his beliefs." The chaplain – whose duty is to offer comments but not a formal recommendation, *see* AR 600–43 ¶ 2-3.*a*.(2) – expressed doubts as to the depth and source of Aguayo's convictions. To find for Aguayo in this case would be to disregard this evidence. We would be reluctant to do so under all but the most extraordinary circumstances, and the record in this case provides no ground to second guess the opinions and conclusions of the Army officers who opposed Aguayo's application.

We review the entire record to determine whether there is a basis in fact for the Army's decision. No single fact or statement is dispositive. Our conclusion is based on the entire record and in particular Aguayo's own application and rebuttal statements. For example, Aguayo's own application materials

provide reason to doubt whether his beliefs developed through "activity comparable in rigor and dedication to the processes by which traditional religious convictions are formulated" or "are the product of a conscious thought process resulting in such a conviction as to allow the person no choice but to act in accordance with them." AR 600–43 ¶ 1-7.*a*.(5)(*b*); *id.* Glossary. Aguayo explained that he was raised by religious parents and that his father is a pacifist. Certainly this upbringing may be a source of his beliefs, but Aguayo also maintains that he was not a conscientious objector when he volunteered for the Army. The Army will consider claims "growing out of" pre-enlistment experiences, so long as the applicant's beliefs become fixed after entering the service. *Id.* ¶ 1-7.*a*.(1). Though Aguayo stated that his Army training caused him anguish and guilt, we find little indication that his beliefs were accompanied by study or contemplation, whether before or after he joined the Army. More to the point, we certainly cannot say that the reviewing officers' doubts as to Aguayo's convictions are so inconsistent with the record that their recommendations must be disregarded. In this appeal, Aguayo insists that the "crystallization" of conscientious objector beliefs, like the process of religious conversion, is not always the result of prolonged study and can instead be dramatic and quick, as when it is precipitated by a life crisis – in Aguayo's case, his experience in weapons training. Clearly, this was not an open-and-shut case: both Aguayo's Company Commander and the investigating officer recommended the application be approved. But the decision in close cases rests with the DACORB, not the courts, and the officers' recommendations are consistent with both the Army's regulations and the record.

In addition, Aguayo applied for discharge as a conscientious objector shortly after arriving at his unit and just days before his deployment to Iraq, a fact noted by the chaplain and which "raise[d] doubts" in the mind of the Staff Judge

Advocate. This court has held that the suspect timing of a CO application is not, in itself, sufficient grounds for its denial. *Bortree v. Resor*, 445 F.2d 776, 784 (D.C. Cir. 1971). The current regulations list timing as a factor that may be considered but expressly provide that timing alone "is never enough to furnish a basis in fact to support a disapproval." AR 600–43 ¶ 1-7.*a*.(5)(*c*). The DACORB in this case could properly find that the circumstances surrounding Aguayo's application constituted a factor that weighed against its approval.

### III

For the foregoing reasons, the order of the district court denying Agustín Aguayo's petition for a writ of habeas corpus is affirmed.

*So ordered.*